**Michael KANE, Plaintiff,**

v.

**David L. WINN, Warden, F.M.C. Devens, Defendant.**

**No. CIV.A.03–40116–WGY.**

United States District Court, D. Massachusetts.

May 27, 2004.

Mark J. Grady, United States Attorney's Office, Boston, MA, for David L. Winn, Bhatti, S. Howard, Respondents.

*MEMORANDUM*

YOUNG, Chief Judge.

## I. INTRODUCTION

**If incarceration rates remain unchanged, 6.6% of U.S. residents born in 2001 will go to prison at some time during their lifetime.[1]**

---

1. Thomas C. Bonczar, Bureau of Justice Statistics, *Prevalence of Imprisonment in the U.S. Population, 1974–2001,* at 2, *at* http://www.ojp.usdoj.gov/bjs/pub/pdf/piusp01.pdf (Aug.2003) [hereinafter *Prevalence of Imprisonment*].

2. The parties designate themselves as "Petitioner" and "Respondent," under the under-

This memorandum explores the consequences of this statistic, which stark as it is, does not even account for incarceration in jails or growing incarceration rates. The particular action here involved a federal prisoner's allegations that his medical treatment fell short of what Bureau of Prisons ("BOP") regulations and the United States Constitution require, and that the BOP retaliated against him for requesting adequate medical care. The prisoner, Michael Kane ("Kane"), moved for appointment of counsel and requested a jury trial. Kane and Federal Medical Center–Devens Warden David L. Winn ("Warden") filed cross motions for summary judgment.

For the reasons discussed below, Kane's Motions for Appointment of Counsel [Doc. No. 14], for a Jury Trial [Doc. No. 5], and for Summary Judgment [Doc. No. 11] were DENIED, the Warden's Motion for Summary Judgment [Doc. No. 7] was ALLOWED, judgment was entered for the Warden, and no further filing fee was assessed.

## II. BACKGROUND

### A. Factual Background

#### 1. Kane's Incarceration and Medical Condition

On March 23, 2000, the United States District Court for the Eastern District of Pennsylvania sentenced Kane to ten years in prison followed by five years of supervised release for distribution of methamphetamines, a violation of 21 U.S.C. 841(a)(1). Def.'s 56.1 Stmt. [Doc. No. 8] ¶ 1; *id.* Ex. 1, Attach. A.[2] On January 4,

---

standing that this is a habeas corpus proceeding. As the Court discusses below, the case is in fact a civil rights action, and the proper parties are "Plaintiff" and "Defendant." The Court will therefore refer to the parties and their pleadings using the latter designations.

2001, he was transferred to Federal Medical Center–Devens ("FMC–Devens") in Ayer, Massachusetts, where he remains incarcerated. *Id.* ¶ 1; *id.* Ex. 1, Attach. F.

Kane, a 47–year–old man, *id.* Ex. 2 (Letter from Hinendi and Guzman to Howard of 2/11/02) [hereinafter "Hinendi Letter"], has a history of hepatitis B and C, diabetes mellitus type I,[3] seizure disorder, asthma, gastroesophageal reflux disease, and peptic ulcer disease. *Id.* Ex. 1, Attach. C (Response to Request for Administrative Remedy # 241172–F1 of 6/15/01). He has chronic hepatitis C, and was apparently first diagnosed with hepatitis C about five years ago. *Id.* Ex. 2. His hepatitis C virus ("HCV") genotype is 1 (1A, to be precise). *Id.* Ex. 1, Attach. G (Algorithm for Treatment of Hepatitis C/Approval Form of 3/6/03). He is overweight, has a history of heavy drinking, and smokes. *Id.*

### 2. Nature, Monitoring, and Treatment of Chronic Hepatitis C

### a. Nature of Chronic Hepatitis C

An understanding of chronic hepatitis C is necessary to an evaluation of Kane's claims. HCV is an RNA virus, transmitted primarily through the blood, and which mainly impacts the liver. Def.'s 56.1 Stmt. Ex. 3, at 8 (*National Institutes of Health Consensus Development Conference Statement—Management of Hepatitis C: 2002* (June 10–12, 2002), at 3–4, *at* http:// odp.od.nih.gov/consensus/cons/116/116 cdc_intro.htm (last modified Sept. 12, 2002) [hereinafter *NIH Statement* ]). It is diffi-

cult for the body's immune system to eradicate. *Id.* Ex. 4 (Nelson Decl.) ¶ 5. It resides in liver cells (hepatocytes), where it replicates and causes cell death (necrosis). *Id.* Infection becomes chronic if it persists for at least six months. *NIH Statement, supra,* at 4.

According to the National Health and Nutrition Examination Survey of 1988—1994, as of 1994, 3.9 million Americans were infected with HCV, an estimated 2.7 million of whom were suffering from chronic infection. *Id.* at 3. That population-based household survey almost certainly underestimated levels of infection, as it did not include the incarcerated, the institutionalized, or the homeless, among all of whom the disease is more prevalent than in the population at large. *Id.* An estimated 35,000 new HCV infections occur every year, and HCV is the most common blood-borne infection nationwide. *Id.* at 4.

As *Harrison's Principles of Internal Medicine,* a medical treatise that both Kane and the Warden cite as an accurate scientific reference, describes: "Milder forms [of chronic hepatitis] are nonprogressive or only slowly progressive, while more severe forms may be associated with scarring and architectural reorganization, which, when advanced, lead ultimately to cirrhosis." Jules L. Dienstag & Kurt J. Isselbacher, *Chronic Hepatitis, in* 2 *Harrison's Principles of Internal Medicine* 1742, 1742 (Eugene Braunwald et al. eds., 15th ed.2001) [hereinafter *Chronic Hepatitis* ]. Twenty percent of those with chronic transfusion-associated hepatitis C (a class that may include Kane) progress to cirrhosis. *Id.* at 1747. Hepatocellular carcinoma ("HCC") can follow,[4] as can end-

---

**3.** One of Kane's administrative appeal decisions states that he has Type II diabetes, probably erroneously. Def.'s 56.1 Stmt. Ex. 1, Attach. D. The precise nature of his diabetes is, however, not important to resolution of

this case—all that matters is whether his diabetes is under control.

**4.** The annual rate of HCC in cirrhotic patients is between one and three percent. *Chronic Hepatitis, supra,* at 1747.

stage liver disease and liver failure. *NIH Statement, supra,* at 4; *Chronic Hepatitis, supra,* at 1747. At least 10,000 to 12,000 deaths result from hepatitis C each year. *NIH Statement, supra,* at 5.

Progression of liver disease in chronic hepatitis C patients is more likely "in patients with older age, longer duration of infection, advanced histologic stage and grade, genotype 1 (especially type 1b), more complex quasispecies diversity,[5] and increased hepatic iron." *Chronic Hepatitis, supra,* at 1747 (footnote added). Duration of infection appears to be the most important of this set of variables, and several of the other factors, such as quasispecies diversity and hepatic iron accumulation, "probably reflect disease duration to some extent." *Id.* Of lesser but still substantial significance is the severity of grade and stage; patients with mild grade and stage tend not to progress to cirrhosis, whereas for patients with moderate or severe grade and stage, "progression to cirrhosis is highly likely over the course of 10 to 20 years." *Id.* Patients who simultaneously suffer from other liver processes, such as chronic hepatitis B,[6] alcoholic liver disease, and hemochromatosis, are also prone to greater severity of chronic hepatitis and faster progression of chronic liver disease. *Id.*

Still, for the majority of patients, the long-term prognosis is "relatively benign":

> Mortality over 10 to 20 years among patients with transfusion-associated chronic hepatitis C has been shown not to differ from mortality in a matched population of transfused patients in whom hepatitis C did not develop. . . .

Overall, then, chronic hepatitis tends to be very slowly and insidiously progressive, if at all, in the vast majority of patients . . . .

*Id.* "Among patients with compensated cirrhosis associated with hepatitis C, the 10–year survival is close to 80 percent . . . ." *Id.*

### b. Classification and Monitoring of Chronic Hepatitis

"Classification of chronic hepatitis is based upon (1) its *cause,* (2) its histologic activity, or *grade,* and (3) its degree of progression, or *stage.*" *Id.* The available classifications by cause include: *"chronic viral hepatitis,* caused by hepatitis B, hepatitis B plus D, hepatitis C, or potentially other unknown viruses; *autoimmune hepatitis,* including several subcategories; types 1, 2, and 3, based on serologic distinctions; *drug-associated chronic hepatitis;* and a category of unknown cause, or *cryptogenic* chronic hepatitis." *Id.* at 1742–43.

"Grade, a histologic assessment of necroinflammatory activity, is based upon examination of the liver biopsy." *Id.* at 1743. At least in clinical practice, grade is typically categorized as "mild," "moderate," or "severe," based on "[a]n assessment of important histologic features," translated into a numerical score based on one of several available scoring systems. *Id.* Typically, the histologic features to be measured include:

> *periportal necrosis* and the disruption of the limiting plate of periportal hepatocytes by inflammatory cells (so-called *piecemeal necrosis* or *interface hepatitis* ); the degree of confluent necrosis

---

5. Genotype and quasispecies diversity refer to the type and the diversity of types of HCV detected.

6. There is no specification in the record whether Kane's hepatitis B is chronic, and the clinical features of the two kinds of chronic hepatitis are similar, *Chronic Hepatitis, supra,* at 1747, but the Court can infer from the record that Kane's hepatitis B is in fact chronic.

that links or forms bridges between vascular structures—between portal tract and central vein—referred to as *bridging necrosis;* the degree of hepatocyte degeneration and focal necrosis within the lobule; and the degree of *portal inflammation.*

*Id.*[7] Of the available scoring systems, "the most popular is the numerical histological activity index (HAI), based on the work of Knodell and Ishak." *Id.* Although the HAI primarily measures grade, it "also includes an assessment of fibrosis, which is currently used to categorize *stage* of the disease." *Id.*

Classification by stage "reflects the level of progression of the disease, [and] is based on the degree of fibrosis." *Id.* "When fibrosis is so extensive that fibrous septa surround the parenchymal nodules and alter the normal architecture of the liver lobule, the histologic lesion is defined as cirrhosis. There are five stages:

0 = no fibrosis
1 = mild fibrosis
2 = moderate fibrosis
3 = severe fibrosis, including bridging fibrosis
4 = cirrhosis"

*Id.*

Michael B. Nelson, Chief of Health Programs for the BOP's Health Services Division ("Division Chief Nelson"), states that "[t]he liver has the capacity to reverse fibrosis up until the development of stage 4." Def.'s 56.1 Stmt. Ex. 4, ¶ 6 (Nelson Decl.). Division Chief Nelson further states that "[i]t is extremely unlikely that an individual will progress more than one stage of fibrosis every ten years." *Id.* ¶ 6. Kane disputes both these statements. He urges that "[t]he precise point at which fibrosis becomes *irreversible is unclear,*" although he cites no medical authority to support his contention. Pl.'s Summ. J. Opp'n at 5–6. Kane's filings also suggest that he considers the typical rate of progression of the disease irrelevant, because numerous factors (such as his age and his hepatitis B) make his liver disease apt to progress more quickly than is typical.

There are several means for determining grade and stage of hepatitis, three of which are relevant here. A physician can obtain the most complete picture from a biopsy, which allows for direct measurement of fibrosis (to determine stage) and of necrosis and inflammation (to determine grade), and gives information on the possible contributions of iron, steatosis, and concurrent alcoholic liver disease to the progression toward cirrhosis. *See Chronic Hepatitis, supra,* at 1743; *NIH Statement, supra,* at 8. The appropriate interval between biopsies "is yet to be determined," *NIH Statement, supra,* at 8, but BOP guidelines suggest an interval of one to five years for patients with normal liver histology or minimal fibrosis, and an interval of one year for patients with minimal fibrosis and marked hepatocellular inflammation and necrosis. *See* Def.'s 56.1 Stmt. Ex. 5, at 44 (*Federal Bureau of Prisons Clinical Practice Guidelines for the Prevention and Treatment of Viral Hepatitis* (Feb.2003)) [hereinafter *BOP Practice Guidelines*]; *see also* Nelson Decl. ¶ 8 (stating that "consideration of a repeat biopsy [for Kane] in three to five years[ ] is appropriate and consistent with BOP guidelines").

A second series of tools measures the levels of HCV in the body, typically by

---

**7.** These four features were evaluated in Kane's September 5, 2002 liver biopsy. Pl.'s Summ. J. Opp'n [Doc. No. 10] App. (Biopsy Report of 9/5/02). Interface hepatitis (or piecemeal necrosis) is item B, bridging necrosis is item D, focal necrosis is item C, and portal inflammation is item A. *Id.*

providing a qualitative or quantitative measure of levels of antibodies against the virus. *See id.* The enzyme immunoassay ("EIA"), for example, is a reproducible, inexpensive, and FDA-approved means of diagnosing HCV infection, "suitable for screening at-risk populations" and "recommended as the initial test for patients with clinical liver disease." *Id.* High levels of HCV load indicate infection, but say little about how likely the disease is to progress or about how far it has progressed. *Id.* at 4. Quantitative assays for levels of HCV RNA (the genetic material of the virus), commonly referred to as "viral load," can be useful, particularly if the same specific quantitative assay is used. *Id.* at 7; Nelson Decl. ¶ 5.

Third, testing for serum levels of alanine aminotransferase ("ALT") "is the most inexpensive and noninvasive, but relatively insensitive, means of assessing disease activity." *NIH Statement, supra,* at 7. Liver cells release ALT, an enzyme, when they are damaged by HCV or other causes, so ALT constitutes a rough indicator of how much inflammation and necrosis (cell death) is occurring. Nelson Decl. ¶ 5. "In most studies, a weak association exists between the degree of ALT elevation and severity of the histopathological findings on liver biopsy." *NIH Statement, supra,* at 7. "Serial determinations of ALT levels over time may provide a better means of assessing liver injury, but the accuracy of this approach has not been well documented." *Id.*

### c. Treatment of Chronic Hepatitis C

### i. Monotherapy with Interferon

There are two approved approaches to antiviral therapy for chronic hepatitis C: monotherapy with interferon and combination therapy with interferon plus ribavirin. *Chronic Hepatitis, supra,* at 1748. In measuring a treatment's effectiveness, "end-treatment response" refers to response measured immediately after treatment ends, and "sustained response" refers to response measured at least six months after treatment. *Id.*

Interferon, administered over a six-month period, produces an end-treatment result of no detectable levels of HCV in approximately 30 percent of patients, but HCV counts go back up for 90 percent of those patients within six months. *Id.* Still, about three-fourths of treated patients experience end-treatment histologic responses—typically reductions in periportal and lobular activity. *Id.* In other words, although the chances of eliminating the virus from the body altogether are quite low, monotherapy can often reduce the progress or severity of liver disease. Sustained responsiveness to monotherapy is more likely in patients with low HCV count and mild grade and stage hepatitis. *Id.* The variables that affect the disease's progress and severity tend to affect the likelihood that therapy will succeed. *See id.*

Results can be improved by increasing the duration of therapy to twelve months or longer. *Id.* Specifically, sustained biochemical and virologic response rises from ten percent to twenty percent. Higher doses or more frequent injections, on the other hand, do not sufficiently improve results to compensate for the cost in intolerability. *Id.* If a patient relapses after a course of interferon therapy, a new course may be effective if dose or (preferably) duration is increased, and under such circumstances sustained response rates as high as forty percent can be achieved. *Id.* If a patient does not respond to an initial course of interferon therapy, future courses are unlikely to produce different results. *Id.*

As for side effects:

Complications of interferon therapy include systemic "flulike" symptoms, marrow suppression, emotional lability (irritability commonly, depression rarely), autoimmune reactions (especially autoimmune thyroiditis), and miscellaneous side effects such as alopecia, rashes, diarrhea, and numbness and tingling of the extremities. With the possible exception of autoimmune thyroiditis, all these side effects are reversible upon dose lowering or cessation of therapy. *Id.* at 1745.

### ii. Combination Interferon–Ribavirin Therapy

Although ribavirin is not by itself effective against HCV, in combination with interferon it is the most effective form of antiviral treatment for chronic hepatitis C. *Id.* at 1748.[8] Six-month courses of treatment have been shown to produce end-treatment response rates over 50 percent and sustained response rates as high as 33 percent, and twelve-month courses have produced response rates over 50 percent and sustained response rates as high as 41 percent. *Id.* at 1748–49. As with monotherapy, the variables that affect the disease's progress and severity tend to affect the likelihood that therapy will succeed. *See id.* at 1749. Side effects are similar to those for interferon monotherapy, but include an additional risk of hemolysis (a reduction in hemoglobin), nasal congestion, pruritus, and precipitation of gout. *Id.*

### iii. Indications and Contraindications for Antiviral Therapy

"All patients with chronic hepatitis C are potential candidates for antiviral therapy."

*NIH Statement, supra,* at 11. Indications for antiviral therapy for chronic hepatitis C patients include elevated ALT levels, detectable HCV RNA, and chronic hepatitis of at least moderate grade and stage. *Chronic Hepatitis, supra,* at 1749; *NIH Statement, supra,* at 11. "Patients with mild hepatitis on liver biopsy are not routine candidates for antiviral therapy, but treatment decisions should be individualized between physician and patient." *Chronic Hepatitis, supra,* at 1749. Similarly, antiviral treatment is not routinely recommended for patients with normal ALT activity. *Id.* "Although response rates are lower in patients with certain pretreatment variables, selection for treatment should not be based on symptoms, genotype, viral load, or the mode of acquisition of infection." *Id.*

### d. Federal Guidelines for Treatment of Prisoners with Chronic Hepatitis C

Under BOP policy, combination therapy can only commence after a prisoner has completed a medical and psychological evaluation and submitted his most current "Algorithm for Treatment of Hepatitis C/Approval Form." Nelson Decl. ¶ 2. The *BOP Practice Guidelines* are based on the *NIH Statement,* and on the suggestions of a number of nationally recognized experts who have independently reviewed the guidelines. *Id.* ¶ 3. Division Chief Nelson states that there is no "community standard" with regard to treatment of hepatitis C, *id.* ¶ 4, but Kane obviously contests this.[9]

---

8. In particular, pegylated interferon in combination with ribavirin produces the best results. *NIH Statement, supra,* at 9.

9. It is unnecessary for the Court to resolve this issue, because the Court holds that

Kane's medical treatment complied with federal law and with the Constitution as of the date when he exhausted his administrative remedies.

A closer examination of provisions in the *BOP Practice Guidelines* demonstrates that they do in fact track the judgments found in the *NIH Statement* and in *Chronic Hepatitis*.[10] For example, BOP physicians considering inmates for antiviral therapy are told to weigh the fact that long-term HCV complications develop in only ten to fifteen percent of patients, and typically not until twenty or thirty years after infection. *BOP Practice Guidelines, supra,* at 41. Physicians are also encouraged to consider "[t]he presence of moderate to severe fibrosis and inflammation and necrosis on liver biopsy ... the best markers for determining who should be offered antiviral therapy for hepatitis C." *Id.* Both statements are consistent with the aforementioned scientific sources. At the same time, the treatment considerations emphasize how few patients require antiviral therapy, how difficult such patients are to identify, how unlikely therapy is to help, how effective future treatments may be, and how many side effects there are, all in a way that suggests somewhat more hostility to antiviral treatment than can be found in the *NIH Statement* or in *Chronic Hepatitis. See BOP Practice Guidelines, supra,* at 41–42.

The *BOP Practice Guidelines* also provide the standards for monitoring inmates with chronic HCV infection, and for determining when, if at all, inmates should undergo a liver biopsy. Patients with minimally elevated ALT (defined as less than two times the normal upper limit), which includes 40 percent of chronic HCV patients, are candidates for a biopsy, particularly if they have a history of alcohol abuse, were infected at an older age, or are to be in prison for a long time, such that a biopsy can facilitate development of a long term treatment plan. *Id.* at 42–43. Patients who consistently have ALT levels at least two times the upper normal limit should receive a biopsy unless antiviral therapy is contraindicated, and patients with suspected compensated cirrhosis should also receive a biopsy. *Id.* at 43. It is recommended that biopsy candidates receive a test for HCV RNA as well. *Id.* None of these procedures is inconsistent with the *NIH Statement* or *Chronic Hepatitis.*

If a patient's biopsy reveals portal or bridging fibrosis and at least moderate inflammation and necrosis, antiviral therapy is "recommended." *Id.* at 44. Inmates who fall short of moderate grade and stage should be rebiopsied every one to five years if they have minimal fibrosis and normal liver histology, or within one year if they have marked hepatocellular necrosis and inflammation. *Id.* Although all HCV genotypes are candidates for treatment, doctors are urged to consider that patients with genotype 1 have response rates of 40 to 45 percent to combination therapy, whereas those with genotypes 2 and 3 have response rates of 76 to 82 percent. *Id.* All of this is consistent with the scientific references in the record.

According to the guidelines, patients with a history of alcohol or drug abuse should be advised of the risks of active substance abuse during treatment. *Id.* at 48. For inmates infected with both hepatitis B virus ("HBV") and HCV, "[a]ntiviral therapy ... should be initiated with great caution, and only in consultation with a specialist ... due to the uncertainty of the risks and benefits of treatment and lack of a recommended treatment regime." *Id.*

---

10. A useful summary of the BOP's recommended strategy for treatment of chronic hepatitis C can be found in Appendix 10 of the *BOP Practice Guidelines. BOP Practice Guidelines, supra,* at 74–75.

The *BOP Practice Guidelines* do not list any "absolute contraindications" for antiviral therapy that apply to Kane. *See id.* at 73. Kane's hepatitis B co-infection, poorly controlled diabetes, and history of recent alcohol abuse or illicit drug usage constitute potentially relevant "relative contraindications," however. *See id.* Again, all of this is consistent with the science in the record, as are the guidelines' recommended pre-treatment screening tests and mental health evaluation, description of the nature, proper administration, and side effects of antiviral therapy, and provisions for monitoring, assessing, and when necessary, retreating patients undergoing such therapy. *See id.* at 44–48.

### 3. Kane's Treatment and Administrative Appeals

According to Kane, he was first diagnosed with hepatitis C about five years ago. Hinendi Letter, *supra,* at 1. He is not sure when he became infected, but he alleges that the disease "had been attacking his liver for at least 8–years." *See* Pl.'s Summ. J. Opp'n at 2. He has been seeking combination therapy since shortly after his transfer to FMC–Devens; on May 25, 2001, he filed for an Informal Resolution to get such treatment, but was unsuccessful. *See* Def.'s 56.1 Stmt. Ex. 1, Attach. C. He filed a request for an administrative remedy on May 29, 2001, presumably after his evaluation during a clinic visit scheduled on the same day. *See id.* The Warden denied the request on June 15, 2001, noting that prison procedures required elevated ALT levels over a period of twelve months, which Kane could not demonstrate, and that his HBV co-infection constituted a relative contraindication for antiviral treatment. *Id.* Kane appealed to the Regional Director on June 26, 2001. *Id.,* Ex. 1, Attach. D. The Regional Director denied the appeal on August 2, 2001, making similar references to prison

procedures and noting that Kane was receiving good medical care, as evidenced by frequent examinations by mid-level practitioners, sequential laboratory tests performed between February and June 2001, and an evaluation by an infectious disease specialist on June 10, 2001. *Id.* Kane appealed to the National Administrator of Inmate Appeals, who denied the appeal on September 20, 2001, with emphasis laid on Kane's normal ALT levels. *Id.* Ex. 1, Attach. E.

A May 2, 2000 report on various tests done on Kane shows an ALT level of 104 IU/L, and lists the reference range as 8 to 40 IU/L. Pl.'s Pet. Mem., Attach. Division Chief Nelson states that the normal range for most laboratories is 40 to 45 IU/L. Nelson Decl., *supra,* ¶ 8. Under either range, Kane's ALT level was more than two times the upper limit. The report also reveals positive results for HBV and HCV. Pl.'s Summ. J. Resp., Ex. at 1.

There is no information in the record about Kane's ALT levels in 2001, apart from statements of prison officials responding to Kane's appeals. Kane underwent an HCV RNA test on April 4, 2001, which revealed a viral load of 4,097,600. *Id.* A July 2003 test revealed an ALT level of 69. *Id.* Ex. at 8.

In early 2002, Kane was referred to the GI/Liver Clinic at the University of Massachusetts Memorial Medical Center in Worcester, Massachusetts. Hinendi Letter, *supra,* at 1. At that time, he expressed his continuing interest in starting combination therapy. *Id.* The doctor noted that his diabetes was apparently well-controlled, and recited the medical history discussed above. *Id.* The physician noted that "the patient is determined to start the medication" and recommended starting combination therapy with follow up testing, including blood work and measure-

ment of his HCV RNA or viral load. *Id.* at 3.

Over the course of 2002, Kane's ALT levels were measured three times, with results of 68, 57, and 56 IU/L. *Id.* Ex. 1, Attach. G. As prison officials state in numerous places in the filings, and as is evident from the "Algorithm for Treatment of Hepatitis C/Approval Form," *see id.*, consistent elevation of at least 1.5 times the upper limit of the normal range over twelve months is an important indicator for antiviral treatment. Even using a normal range of 8 to 40 IU/L (as opposed to 40 to 45 IU/L), Kane's ALT levels were not consistently 1.5 or more times the upper limit during the testing period.

Kane underwent a liver biopsy in September 2002, and the HAI was apparently used to measure grade. *See* Pl.'s Summ. J. Opp'n, App. A score of 0–6 indicates mild grade, and Kane received a 5. *Id.* In particular, he showed some portal inflammation, interface hepatitis (piecemeal necrosis), and focal (spotty) lobular inflammation, but no confluent necrosis (also called bridging necrosis). *Id.* As for stage, on a scale of 0 to 4, Kane received a 1, showing mild fibrosis.[11] *Id.; Chronic Hepatitis, supra,* at 1743. As mentioned earlier, one important indicator for antiviral treatment under the *BOP Practice Guidelines* is the presence of either portal or bridging fibrosis and at least moderate inflammation and necrosis. *BOP Practice Guidelines, supra,* at 44. As of the biopsy, Kane had portal inflammation and some fibrosis, but his inflammation and necrosis (as expressed in grade) were "mild," not yet "moderate."

Kane received his psychiatry/psychology clearance on February 26, 2003, after which he was considered for antiviral treatment but denied on March 6, 2003. Def.'s 56.1 Stmt. Ex. 1, Attach. G. Division Chief Nelson noted Kane's minimal inflammation and fibrosis, and recommended a repeat biopsy in three to five years. *Id.* Although Kane previously had regular visits with doctors monitoring his condition, a June 2003 report indicated that he had not seen a doctor for approximately five months. *See* Def.'s 56.1 Stmt. Ex. 1, Attach. F (Inmate History as of 6/25/03).

## B. Procedural Posture

Kane filed a petition for habeas corpus relief under 28 U.S.C. § 2241 on April 28, 2003. [Doc. No. 1]. He also alleged jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, 18 U.S.C. § 4042, and 28 U.S.C. § 1361.[12] Pl.'s Pet. Mem. at 2. His petition alleges that the staff at FMC–Devens improperly denied him proper medical care and retaliated against him for seeking relief. *Id.* at 4–5. He sought an order compelling administration of proper medical treatment, transfer to another facility, or release from FMC–Devens. *Id.* at 1–2, 12.

Pursuant to this Court's order dated July 18, 2003, Kane's claims against two FMC–Devens doctors, Dr. Sandra Howard and Dr. Fazal Bhatti, were dismissed, leaving only his claims against the Warden. Kane and the Warden filed cross motions for summary judgment, and Kane requested appointment of counsel and a jury trial.

---

11. A score of 2 would have meant that Kane's stage was "moderate," not "mild."

12. 18 U.S.C. § 4042(a)(2) requires the BOP to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all [fed-

eral prisoners]." 28 U.S.C. § 1361 gives the district courts original jurisdiction over actions in the nature of mandamus to compel federal officers and employees to perform duties owed to a plaintiff.

## III. DISCUSSION

### A. Role of the Courts in Protecting Prisoners' Rights

This case presents four questions of particular significance. First, what rights does Kane have under the Constitution and under relevant statutes and regulations? Second, are Kane's rights under statutes and regulations enforceable in court? Third, are Kane's claims the sort that habeas corpus petitions can appropriately address? Fourth, if a habeas petition is not the proper vehicle for Kane's claims, how should the Court treat his petition, particularly in light of new restrictions embodied in the Prison Litigation Reform Act? In answering these questions of statutory interpretation and constitutional law, the Court must consider the social and political realities that prisoners confront, the human rights commitments embodied in our Constitution, in our legal traditions, and in international law, and the role that courts have historically played in realizing those commitments.

As a marginalized group, prisoners are especially apt to require judicial protection. The United States has both a strong commitment to human rights and a clear history of human rights violations against prisoners, making such protection particularly appropriate and necessary. In light of these legal and empirical factors, courts should read prisoner petitions generously, give them careful consideration, and resolve statutory ambiguities in prisoners' favor. Because the Court's re- search has revealed numerous cases that failed to do so, and that closed the courthouse doors to prisoners in the process, an extensive discussion is in order.[13]

### 1. Prisoners and American Society

As Fyodor Dostoevsky once said: "The degree of civilization in a society can be judged by entering its prisons." Dostoevsky spoke from experience, having spent several years as a prisoner in his native Russia, and the brutal trials he endured tell us much about the governing order in his homeland at that time. Prison conditions provide a particularly accurate barometer of a society's values, because the society's conception of human rights, of the basic dignity to which a person is entitled because of the simple fact of her humanity, is typically the primary, sometimes even the only constraint on what sufferings the state can impose. Even in the United States, an affluent and industrialized nation with a stable representative democracy and a comparatively strong civil rights tradition, serious human rights violations occur in the prison system, although there is disagreement about their frequency and severity.

Prisoners are not a sympathetic minority; certainly in this country, there are few places where a politician will win votes by standing up for the rights of prisoners. *See* Harold J. Krent, *The Puzzling Boundary Between Criminal and Civil Retroactive Lawmaking*, 84 Geo. L.J. 2143, 2169 (1996). Few prisoners have any substantial wealth with which to influence elections or even public policy debates,[14] and their ability to communicate with their fel-

---

13. Judges spend little time on prisoner suits. Between 1987 and 1993, the average inmate civil rights case, from filing to disposition, took under an hour of Article III judge time, which is troubling even in light of the responsibilities delegated to pro se law clerks and magistrate judges. Margo Schlanger, *Inmate Litigation*, 116 Harv. L.Rev. 1555, 1589–90 (2003) [hereinafter *Inmate Litigation I* ] (citing a Federal Judicial Center Study). The facts that inmate cases rarely settle and that a small number of comprehensive court order cases take an extraordinary amount of time make this low figure even more alarming. *Id.*

14. Of course, some prisoners are affluent, and are able to influence public affairs during or

low citizens, the primary alternative means available to influence public policy, is obviously severely limited. *See id.* Moreover, the prison population draws largely from groups who are already marginalized in our society, including the poor, the mentally ill, and to a frightening degree, racial minorities. *See id.*[15]

### a. Lack of Political Power

Perhaps even more important than prisoners' lack of opportunity to participate in public debate is the fact that prisoners themselves generally cannot vote. *See generally Developments in the Law—The Law of Prisons,* 115 Harv. L.Rev. 1838, 1939–63 (2002) [hereinafter *Law of Prisons* ]; *see also Richardson v. Ramirez,* 418 U.S. 24, 54–56, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (holding that disenfranchisement of convicted criminals, without more, does not violate the Equal Protection Clause of the Fourteenth Amendment).[16] Only two states, Maine and Vermont, per-

after their incarceration. Simon C. Fireman, who spent six months under house arrest for violating campaign finance laws, has published a book that decries the present system of American criminal justice and sentencing. *See* Simon C. Fireman, *No Justice: The 6 Million Dollar Disaster* 129–76 (1999). Charles Colson, who went to prison for his role in the Watergate scandal, has since his release founded the Prison Fellowship Ministries and become "an effective spokesman on behalf of prison and sentencing reform." Marc Mauer, *The Last of the Disenfranchised,* Newsday, Nov. 3, 2002, at A30, *available in* 2002 WL 102167524. Similarly, Sol Wachtler, former Chief Justice of New York, published a memoir of his year in prison and has become an advocate for sentencing reform. *See* Sol Wachtler, *After the Madness; A Judge's Memoir of His Time in Prison* (2003) He has also become "a passionate advocate for the legal rights of the mentally ill." Joe Mahoney, *He's Real Work of Art: Wachtler Portrait Will Get Spot in Court,* N.Y. Daily News, June 5, 2001, at 8, *available in* 2001 WL 17953770.

**15.** The correlation between a group's marginal status in society and its representation in the prison population is neither a new nor a surprising phenomenon. *See generally* Michel Foucault, *Discipline and Punish: The Birth of the Prison* (Alan Sheridan trans., Vintage Books 2d ed.1995) (1978) (tying trends in penological history to larger trends in social and political history); Michel Foucault, *Madness and Civilization: A History of Insanity in the Age of Reason* 38–84, 221–40 (Richard Howard trans., Vintage Books 1988) (1961) [hereinafter *Madness and Civilization* ] (discussing the often brutal confinement of the poor and the insane during the seventeenth, eighteenth, and nineteenth centuries).

**16.** Numerous studies have examined the nature and effects of disenfranchisement of individuals convicted of crimes in this country. *See, e.g.,* Patricia Allard & Marc Mauer, *Regaining the Vote: An Assessment of Activity Relating to Felon Disenfranchisement Laws,* at http:// www.soros.org/initiatives/justice/articles_publications/publications/regainingthe vote_20000101/regainingthe vote.pdf (Jan. 2000); Common Cause, *Not Making the Grade: On Anniversary of Florida Fiasco, Common Cause Education Fund Releases Report on How States Have Responded to Need for Election Reform,* at http: //216.147. 192.101/publications/nov01/110601.htm (Nov. 6, 2001); Jamie Fellner & Marc Mauer, *Losing the Vote: The Impact of Felony Disenfranchisement Statutes in the United States,* at http:// www.soros.org/initiatives/justice/articles_publications/publications/losingthevote _19981001/losingthevote.pdf (Oct.1998); John Mark Hansen, Task Force on the Federal Election System, *To Assure Pride and Confidence in the Electoral Process* ch. 8, *at* http:// www.reformelections.org/data/task_2/t2_ reports/b_electionsystem.pdf (Aug.2001); Christopher Uggen & Jeff Manza, *Democratic Contraction? Political Consequences of Felon Disenfranchisement in the United States,* 67 Am. Soc. Rev. 777 (2002), *available at* http:// www.sentencing project.org/pdfs/UggenManza.pdf (last visited Apr. 30, 2004); *see generally* The Sentencing Project, *Felony Disenfranchisement: A Review of Scholarly Literature,* at http:// www.sentencingproject.org/pdfs/fvrlitreview.pdf (last visited Apr. 30, 2004).

In the world at large, it is not uncommon to deny the vote to felons during incarceration:

mit prisoners to vote during their incarceration. *Law of Prisons, supra,* at 1942 & n. 21; *see* Me.Rev.Stat. Ann. tit. 21–A, § 112(14); Vt. Stat. Ann. tit. 28, § 807(a).[17] Many states also limit the right of those convicted of crimes [18] to vote after their incarceration ends, thus making it even less likely that their experience with the prison system cannot translate into legisla-tive reforms.[19] In California, Colorado, Connecticut, and New York, neither the incarcerated nor parolees can vote. *Law of Prisons, supra,* at 1943 & n. 26. Thirty states deny the vote not only to parolees, but also to felony probationers.[20] The Sentencing Project, *Felony Disenfranchisement Laws in the United States* 3, *at* http:// www.sentencingproject.org/pdfs/ 1046.pdf (Apr.2004). Fourteen of those

nations like the United Kingdom, Russia, and many of the post-Soviet republics do, although many other countries, including Ireland, Spain, Sweden, Denmark, Greece, South Africa, and Australia, do not, and countries such as Austria, Belgium, Italy, Norway, Canada, and New Zealand permit some classes of prisoners to vote. Uggen & Manza, *supra,* at 778. As Professors Uggen and Manza note, however, "[a]mong postindustrial democracies, the United States is virtually the only nation to permanently disenfranchise ex-felons as a class in many jurisdictions, and the only country to limit the rights of individuals convicted of offenses other than very rare treason or election-related offenses." *Id.* The United States also issues felony convictions at a much higher rate than other industrial democracies—686 per 100,000 population in 2000, as compared to rates of 105 in Canada, 95 in Germany, and 45 in Japan. *Id.* and sources cited. The combination of these latter two factors makes disenfranchisement of nonincarcerated criminals a uniquely serious problem in the United States.

17. Even Maine and Vermont disenfranchise "those convicted of treason, bribery, and election offenses." *Law of Prisons, supra,* at 1942 n. 21 (quoting a pre-publication draft of Uggen & Manza, *supra* ).

18. The Court does not use the term "felon," often used in discussing the disenfranchisement problem, because it is in fact possible to lose the vote for conviction of misdemeanors, or of crimes that, though now defined as "felonies," would not until fairly recently in American history have been regarded as such. *See* George P. Fletcher, *Disenfranchisement as Punishment: Reflections on the Racial Uses of Infamia,* 46 UCLA L.Rev. 1895, 1899 (1999) (noting the modern expansion of the concept of "felony").

In Delaware, for example, one can lose the right to vote if convicted of participation with others "in a course of disorderly conduct." Del.Code Ann. tit. 11, § 1302 (defining the crime of "riot" as a felony). This is particularly frightening, given that individuals arrested for participating in civil disobedience or even in lawful protest are often charged with crimes like "disorderly conduct." An individual can also lose the vote for "aiding or inducing another to engage in gambling." Wyo. Stat. Ann. §§ 6–7–101(a)(vii), –102. *See Law of Prisons, supra,* at 1940 & nn. 6–9; *see also* Fellner & Mauer, *supra,* at 6 (noting that conviction of shoplifting can lead to disenfranchisement, and that some states impose disenfranchisement for any crime punishable by imprisonment, which would obviously include numerous misdemeanors).

19. *See McLaughlin v. City of Canton,* 947 F.Supp. 954, 971 (S.D.Miss.1995) ("Disenfranchisement is the harshest civil sanction imposed by a democratic society. When brought beneath its axe, the disenfranchised is severed from the body politic and condemned to the lowest form of citizenship, where voiceless at the ballot box the disenfranchised, the disinherited must sit idly by while others elect his civic leaders and while others choose the fiscal and governmental policies that will govern him and his family.").

20. These thirty are Alabama, Alaska, Arizona, Arkansas, Delaware, Florida, Georgia, Iowa, Kansas, Kentucky, Maryland, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. The Sentencing Project, *Felony Disenfranchisement Laws in the United States* 3, *at* http:// www.sentencingproject.org/ pdfs/1046.pdf (Apr.2004).

states permanently disenfranchise some category or categories of convicted criminals who have completed their sentences, beyond the ordinary categories of treason and election-related offenses, and seven of these states—Alabama, Florida, Iowa, Kentucky, Mississippi, Nebraska, and Virginia—permanently disenfranchise first-time offenders. *Id.*

A glance at the racial disparities in disenfranchisement reinforces the Court's point about the overlap between the prison population and other disfavored groups in society. As of December 31, 2000, 4,686,-539 Americans, 2.28% of the voting age population, were disenfranchised for convictions of crimes, an estimated 1,654,497 of whom had completely served their sentences, and only 1,209,243 of whom were in prison. Uggen & Manza, *supra,* at 797 app. tbl. A. In comparison, among African Americans, 1,841,515 African Americans, 7.48% of the African American voting age population, were disenfranchised due to convictions of crimes, of which 550,308 had completed their sentences, and 632,474

were still in prison. *Id.* at 798 app. tbl. B. Thus, African Americans are disenfranchised at 3.28 times [21] the rate in the general population.[22]

The problem of disenfranchisement of Latinos in America has been less studied, but one study of the extent of the problem in ten states revealed that in at least six of those states, Latinos were disenfranchised at a higher rate than the general population. *See* Marisa J. Demeo & Steven A. Ochoa, *Diminishing Voting Power in the Latino Community: The Impact of Felony Disenfranchisement Laws in Ten Targeted States* 16–17, *at* http:// www.sentencingproject.org/pdfs/maldef-rpt.pdf (Dec. 2003).[23] Because many Latinos counted in the census are not in fact citizens, when citizenship was taken into account, the results became starker, showing disparities in at least nine of the states. *See id.* Leaving out Virginia (for which data were unreliable),[24] taking the unweighted average proportion of disenfranchised Latinos to disenfranchised members of the population among the remaining states, and ac-

---

**21.** It appears that Professors Uggen and Manza did not account for the fact that some portion of the individuals counted in the census are non-citizens, and thus ineligible to vote. *Compare* Uggen & Manza, *supra,* at 797 app. tbl. A (listing voting age population for California as 24,873,000, based on 2000 census data), *with* Marisa J. Demeo & Steven A. Ochoa, *Diminishing Voting Power in the Latino Community: The Impact of Felony Disenfranchisement Laws in Ten Targeted States* 16–17, *at* http:// www.sentencing project.org/pdfs/maldef-rpt.pdf (Dec.2003) (listing citizen voting age population for California at 20,-011,574, based on 2000 census data). Yet even if the difference between voting age population and citizen voting age population were as significant nationwide as it is in California, an unlikely proposition, African Americans would be disenfranchised at at least 2.64 times the rate in the general population. It may be, however, that failing to account for citizenship cuts both ways, because a significant number of black people in this country

are non-citizens (from Haiti, for example). *Cf.* Demeo & Ochoa, *supra,* at 16–17 (demonstrating how accounting for citizenship increases disenfranchisement disparities between Hispanics and the population at large). The Court will therefore continue to refer to the 3.28 figure, subject to these caveats.

**22.** Disparities are worse within individual states. For example, there are two states in which one in three black men is disenfranchised, and eight states in which one in four black men is disenfranchised. Fellner & Mauer, *supra,* at 1.

**23.** The states were Arizona, California, Florida, Nebraska, Nevada, New York, North Carolina, Texas, Virginia, and Washington.

**24.** Virginia's Department of Corrections does not collect data on Latino inmates, making an evaluation of Latino disenfranchisement for that state difficult. Demeo & Ochoa, *supra,* at 17.

counting for citizenship, the study reveals that in those nine states Latinos are disenfranchised at 1.73 times the rate seen in the general population. *See id.* at 17. This is less stark than the 3.28 figure for African Americans, but it is still cause for concern. *Compare* Demeo & Ochoa, *supra,* at 17, *with* Uggen & Manza, *supra,* at 797–98, app. tbls. A–B; *see also* Demeo & Ochoa, *supra,* at 19–21 (comparing Latino and African American disenfranchisement rates in the ten states studied, and revealing much greater disparities for the latter group).

### b. High Representation of Marginalized Groups in the Incarcerated Population

These numbers are hardly surprising, given the substantial over-representation of racial minorities in the prison population.[25] Human Rights Watch has usefully summarized data from the 2000 census, which reveals that African Americans, though making up only 12.3% of the population, constitute 43.7% of the country's incarcerated population. Human Rights Watch, *Race and Incarceration in the United States* tbl. 4, at http://hrw.org/backgrounder/usa/race/#P10_1649 (Feb. 27, 2002) [hereinafter *Race and Incarceration in the United States* ]. Similarly, though less starkly, Latinos make up 12.5% of the population, but constitute 16.5% of the country's prison population. *Id.* tbl. 5.[26] Among youths under 18 nationwide, Latino youths are incarcerated at twice the rate of white American youths, and African American youths are incarcerated at 5.3 times the rate of white American youths. *Id.* tbl. 7. As one might expect, there are numerous states where the racial disparities in all these regards are even more shocking than the national averages. *Race and Incarceration in the United States, supra.*[27]

25. *See generally* Steven Kalogeras, The Sentencing Project, *Annotated Bibliography: Racial Disparities in the Criminal Justice System,* at http:// www.sentencing project.org/ pdfs/5007.pdf (2003) (summarizing existing research on this subject).

26. *See also* The Sentencing Project, *Hispanic Prisoners in the United States,* at http:// www.sentencing project.org/pdfs/ 1051.pdf (Aug.2003) (discussing the racial disparities between Hispanic Americans and white Americans in the criminal justice system).

27. The racial disparities are perhaps worst in the area of drug offenses, at least as between African Americans and white Americans. A Human Rights Watch study found that as of 2000, African Americans constituted 62.7% of all drug offenders admitted to state prison, which means that, relative to population, they were admitted at 13.4 times the rate of white Americans. Human Rights Watch, *Punishment and Prejudice: Racial Disparities in the War on Drugs* ch. 1, at http:// www.hrw.org/reports/2000/usa (May 2000). In at least fifteen states, African American men were admitted to state prison on drug charges at rates ranging from 20 to 57 times that for white men. *Id.* Thus, one in twenty African American men was in state or federal prison, as compared to one in 180 white American men. *Id.* This occurred despite the lack of any meaningful difference in drug use rates among the races. *See* Office of Applied Studies, United States Dep't of Health & Hum. Servs., *2001 National Household Survey on Drug Abuse: Highlights,* at http:// www.oas.samhsa.gov/nhsda/2k1nhsda/vol1/ highlights.htm (last updated Mar. 29, 2004) (reporting that illicit drug use occurred among 7.4% of African Americans, 7.2% among white Americans, and 6.4% among Hispanic Americans).

Racial disparities also exist in the imposition of the death penalty: although there is disagreement regarding the extent to which a criminal defendant's race influences imposition of the death penalty, most studies have found that an individual convicted of killing a white American is substantially more likely to receive the death penalty than is an individual convicted of killing an African American. *See, e.g.,* U.S. Gen. Accounting Office, *Death*

The mentally ill are also well-represented in the prison population.[28] Somewhere between eight and twenty percent of incarcerated people suffer from a serious mental illness, as compared to about five percent of the population at large. Human Rights Watch, *Ill–Equipped: U.S. Prisons and Offenders with Mental Illness* ch. 3, *at* http:// www.hrw.org/reports/2003/usa1003 (Sept.2003) [hereinafter *Ill–Equipped*] (citing numerous studies). These estimates translate into approximately 300,000 mentally ill inmates, with perhaps 70,000 who are psychotic. *Id.* A 1999 report by the federal Bureau of Justice Statistics estimates that sixteen percent of state and federal adult prisoners and a similar percentage of adults in jail were mentally ill, which would translate into over 230,000 adults with mental illness in prisons and over 106,000 in jails. *See id.* (citing Paula M. Ditton, Bureau of Justice Statistics, *Mental Health and Treatment of Inmates and Probationers* 3, *at* http:// www.ojp.usdoj.gov/bjs/abstract/mhtip.htm (July 1999)), and Paige M. Harrison & Allen J.

Beck, Bureau of Justice Statistics, *Prisoners in 2002*, *at* http:// www.ojp.usdoj.gov/bjs/pub/pdf/p02.pdf (July 2003) [hereinafter *Prisoners in 2002*]. Commenting on the high number of mentally ill inmates in Texas, Judge William Wayne Justice has said:

> It is deplorable and outrageous that this state's prisons appear to have become a repository for a great number of its mentally ill citizens. Persons who, with psychiatric care, could fit well into society, are instead locked away, to become wards of the state's penal system. Then, in a tragically ironic twist, they may be confined in conditions that nurture, rather than abate, their psychoses.

*Ruiz v. Johnson*, 37 F.Supp.2d 855, 915 (S.D.Tex.1999).[29]

The poor and uneducated also make up a substantial portion of the incarcerated population. For example, 68% of state prison inmates in 1997 had not completed high school. The Sentencing Project, *Facts About Prisons and Prisoners* 1, *at*

*Penalty Sentencing: Research Indicates Pattern of Racial Disparities* 5 (Feb.1990), *available at* http://www.gao.gov (providing a synthesis of 28 studies that showed a "pattern of evidence indicating racial disparities in the charging, sentencing, and imposition of the death penalty"); David C. Baldus et al., *Racial Discrimination and the Death Penalty in the Post–Furman Era: An Empirical and Legal Overview, with Recent Findings from Philadelphia*, 83 Cornell L.Rev. 1638, 1661 (1998) (finding evidence of race-of-victim disparity in 90% of states studied and race-of-defendant disparities in 55%); *see also Ring v. Arizona*, 536 U.S. 584, 617, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (Breyer, J., concurring in the judgment) (citing the General Accounting Office Report and the Baldus et al. article).

It would be inappropriate for this Court to speculate on the extent to which racial disparities in incarceration, drug crime prosecution and sentencing, and imposition of the death penalty are a result of conscious or unconscious racial bias, either in the design of criminal statutes, the enforcement of those

statutes, the adjudication of criminal prosecutions, or in the design of economic and social policies.

**28.** This has been a problem in western countries since at least the seventeenth century. *See Madness and Civilization, supra,* at 38–78, 221–43.

**29.** The litigation surrounding the Texas prison system has a long and tortured history. In *Ruiz v. Estelle*, 503 F.Supp. 1265 (D.C.Tex. 1980), Judge Justice found numerous violations of the Eighth Amendment in the Texas prison system. The Fifth Circuit agreed that the prison system was in violation of the Eighth Amendment, although it reversed many parts of the district court's decree. *Ruiz v. Estelle*, 679 F.2d 1115, 1163 (5th Cir.1982), *amended and vacated in part on other grounds*, 688 F.2d 266 (5th Cir.1982). In the most recent installment, *Ruiz v. Johnson*, 154 F.Supp.2d 975, 1001 (S.D.Tex.2001), Judge Justice held that the prison system still had serious constitutional infirmities.

http:// www.sentencing project.org/pdfs/ 1035.pdf (Oct.2003) (citing figures published by the Bureau of Justice Statistics). In 1996, 36% of jail inmates were unemployed prior to entering jail, and 64% of jail inmates had monthly incomes of under $1,000 in the month before their arrest. Caroline Wolf Harlow, Bureau of Justice Statistics, *Profile of Jail Inmates 1996* 3–4, at http:// www.ojp.usdoj.gov/ bjs/pub/pdf/pji96.pdf (Apr.1998) [hereinafter *Profile of Jail Inmates* ].

Children constitute another vulnerable group that is increasingly represented in the prison population. *See generally* Amnesty International, *Betraying the Young: Human Rights Violations Against Children in the U.S. Justice System,* at http:// web.amnesty.org/library/index/ENGAMR 510571998 (Nov. 20, 1998); Human Rights Watch, *Children in Confinement in Louisiana* at http:// www.hrw.org/ reports/1995/Us3.htm (Oct.2000); Human Rights Watch, *Detained and Deprived of Rights: Children in the Custody of the U.S. Immigration and Naturalization Service* at http:// www.hrw.org/reports98/ins2 (Dec.1998) [hereinafter *Detained and Deprived of Rights* ]; Human Rights Watch, *High Country Lockup: Children in Confinement in Colorado,* at http:// www.hrw.org/reports/1997/usacol (Aug.1997); Human Rights Watch, *No Minor Matter: Children in Maryland's Jails,* at http:// www.hrw.org/reports/1999/maryland (Nov.1999) [hereinafter *Children in Maryland's Jails* ]; Human Rights Watch, *Slipping Through the Cracks: Unaccompanied Children Detained by the U.S. Immigration and Naturalization Service,* at http:// www.hrw.org/reports/1997/uscrcks (Apr. 1997) [hereinafter *Slipping Through the Cracks* ]. Incarcerated children are obviously at greater risk of violence from both other children and adults. *See, e.g., Children in Maryland's Jails, supra,* at ch. 1.

Moreover, sensory deprivation in solitary confinement, poor nutrition and medical care, and other deprivations common in prisons and jails weigh harder on children than on adults. *See, e.g., id.*

Immigrant detainees constitute yet another marginalized and vulnerable group in the incarcerated population. *See generally Detained and Deprived of Rights, supra;* Human Rights Watch, *Locked Away: Immigration Detainees in Jails in the United States,* at http:// www.hrw.org/reports98/us-immig (Sept.1998); *Slipping Through the Cracks, supra.* As of 1998, the Immigration and Naturalization Service ("INS") was housing 60 percent of its detainees in local jails, despite their noncriminal status. *Immigration Detainees in Jails, supra,* at ch. 1. The conditions in jails and prisons, troubling as they are for incarcerated criminals, are even more so for immigrant detainees, whose confinement is not supposed to constitute punishment. Moreover, foreign citizens may have more difficulty in seeking redress for violations of their rights, particularly if they cannot speak English well.

### c. Size of the Incarcerated Population

Of course, the marginality and vulnerability of the prison population are not the only reasons for concern about its exposure to human rights violations. The sheer number of incarcerated people in the United States means that any human rights problems in our prisons, particularly if they are at all systemic, will impact a great many of our citizens. At the end of 2002, 2,166,260 persons were incarcerated in the United States (1,361,258 in federal and state prisons, 665,475 in jails, and 6.5% of in private prisons). *Prisoners in 2002, supra,* at 1–2, 6. The number of incarcerated individuals has increased an average of 3.6% per year since 1995. *Id.* This means that as of 2002, the United States incarcer-

ated its citizens at a rate of 702 per 100,-000, and that we have finally surpassed Russia in incarcerating a larger percentage of our population than any country in the world. Marc Mauer, The Sentencing Project, *Comparative International Rates of Incarceration: An Examination of Causes and Trends* 1–2, at http://www.sentencingproject.org/pdfs/pub9036.pdf (June 20, 2003).[30] Indeed, we incarcerate at five to eight times the rate of Canada and the countries of Western Europe. *Id.*

As reported above, estimates indicate that if the 2001 incarceration rate of 685 per 100,000 population[31] remained steady, 6.6% of persons born in this country in 2001 would spend time in state or federal prison during their lifetimes. *Prevalence of Imprisonment, supra* at 2. Given that the rate of incarceration has since increased 2.6%, *see Prisoners in 2002, supra*, at 1, with no sign that it will stop growing, and that the government's figures do not include jails, *see Prevalence of Imprisonment, supra,* at 2 (stating that there were 1,319,000 adults confined in state or federal prisons the end of 2001), the percentage of individuals born in 2001 who will be incarcerated over their lifetimes is obviously higher. Because turnover rates in jails are on average higher than those in prisons, and because roughly one third of currently incarcerated people are in jail, *see Prisoners in 2002, supra,* at 1–2, it would not surprise the Court if over ten percent of people born in the United States this year will be incarcerated over their lifetime.

## 2. Deprivations that Prisoners Face

Although the marginality of the prison population is reason enough for heightened

judicial protection, the persistence of human rights violations in our prisons provides further justification. When courts consider prisoner petitions, they must be aware of the many kinds of violations that occur. Even if human rights violations are not systemic, they occur with sufficient frequency that judges should be attuned to the possibility that one has occurred in a particular case. Moreover, even if a particular petition alleges a sort of violation that rarely occurs, any generally applicable statutes or other laws must be interpreted in light of the overall level of violations occurring in our prisons.

Prisoners face several kinds of deprivations. In May 2000, the United Nations Committee Against Torture considered the United States' initial report on implementation of the United Nations Convention Against Torture. *See* Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR, 39th Sess., Supp. No. 51, at 197, U.N. Doc. A/39/51, *available at* http://www.unhchr.ch/html/menu3/b/h_cat39.htm [hereinafter "Convention Against Torture"]. Amnesty International ("AI") describes the Committee's response as follows:

In its conclusions and recommendations the Committee welcomed "the extensive legal protection" against torture and ill-treatment in the USA but found failings in important areas, many of which had been raised by AI.

Areas of concern highlighted by the Committee included torture and ill-treatment by police and prison guards—

---

**30.** The Court notes the possibility that one or more nations with totalitarian governments may under-report incarceration rates, and may thus in reality have higher rates than the United States.

**31.** This rate is reported in *Prisoners in 2002, supra,* at 2.

much of it racially motivated; the sexual abuse of female prisoners by male guards; prisoner chain gangs; and the "excessively harsh regime" of supermaximum security (isolation) units. The Committee urged the USA to abolish electro-shock stun belts and restraint chairs, stating that their use "almost invariably" led to breaches of the Convention; and to cease holding juveniles and adult prisoners together.

Amnesty International, *United States of America in Amnesty International Report 2001 at* http:// web.amnesty.org/web/ar2001.nsf/webamrcountries/UNITED + STATES + OF + AMERICA?OpenDocument (2001). This Court's own experience lends credibility to this assessment. In roughly a quarter century of judging, this Court has sentenced three criminals who later died of unnatural causes in prison: one was murdered, one committed suicide, and one died of a heart attack that might well not have occurred, and in any case likely would not have been fatal, had he not been in prison.

There are many cases that present virtually all of the problems the Committee Against Torture discussed. For example, on October 12, 1994, the Criminal Justice Complex in the Virgin Islands entered into a consent decree regarding prison conditions, but three years later, the court found that: the prison was still housing close to twice as many inmates as the consent decree permitted (and over three times as many inmates as the facility was designed to house); many inmates had to sleep on mattresses on the floor, often with their heads against the toilet, such that other inmates would urinate on them during the night; the mattresses were soiled, damaged, rarely exchanged, and often soaking wet; the roofs were leaking; light fixtures and hot water heaters were not functioning; the drinking water was unsanitary; inadequate ventilation was creating an environment where disease could spread easily; cells were flooded; rodents and cockroaches infested the facility; fire safety provisions and medical care and equipment were inadequate; neither mentally ill inmates nor violent inmates were housed separately from other inmates; mental health services were nonexistent; prison authorities failed to prevent violence, particularly gang violence, and also used excessive force against inmates; and prison policies violated the Americans With Disabilities Act and inmates' constitutional rights to free exercise of religion and access to courts, law libraries, mail, telephone, and visitation. *See Carty v. Farrelly,* 957 F.Supp. 727, 732 & n. 3, 735–42 (D.V.I.1997). Four years later, the court found continuing violations, and *sua sponte* held the relevant Virgin Islands officials in contempt. *Carty v. Turnbull,* 144 F.Supp.2d 395, 419 (D.Vi.2001).

The federal government has investigated numerous correctional facilities in recent years, and has found what it considers to be extensive constitutional violations in at least seventeen states and territories.[32]

---

**32.** Letters sent from the Department of Justice to state and local officials regarding the results of these investigations are posted in the Special Litigation Section of the Department of Justice website. *See* Special Litigation Section, Department of Justice, *Documents and Publications, at* http://www.usdoj.gov/crt/split/http://www.usdoj.gov/crt/split/findsettle.htm# Findings Letters (last visited May 3, 2004). Each letter reveals that the federal government has found constitutional violations in most or all of the following areas: fire safety, security and protection from harm, medical and mental health care, environmental health and safety, opportunities to exercise, and access to courts. *See id.* In 2003, letters were sent regarding facilities in California, Mississippi, New Mexico, Oklahoma, and Virginia. *Id.* In 2002, letters were sent

The United States has filed lawsuits under the Civil Rights of Institutionalized Persons Act of 1980, 42 U.S.C. §§ 1997–1997j, against state and county officials in Arizona, Georgia, Kentucky, Louisiana, Michigan, Mississippi, New York, the Northern Mariana Islands, Tennessee, and Wyoming. *See* Special Litigation Section, U.S. Department of Justice, *Documents and Publications*, at http://www.usdoj.gov /crt/split/findsettle.htm# Settlements (last visited May 6, 2004). Most of these lawsuits have led to a settlement or consent decree.[33]

One of the most famous descriptions of degrading prison conditions is Judge Justice's 125–page opinion in *Ruiz v. Estelle*, 503 F.Supp. 1265 (D.C.Tex.1980), which found "rampant overcrowding, inadequate security, substandard health care, inappropriate disciplinary practices, and substantially impeded access to the courts" in the Texas prison system. *Id.* at 1384. As Judge Justice said:

> [I]t is impossible for a written opinion to convey the pernicious conditions and the pain and degradation which ordinary inmates suffer within TDC prison walls— the gruesome experiences of youthful first offenders forcibly raped; the cruel and justifiable fears of inmates, wondering when they will be called upon to defend the next violent assault; the sheer misery, the discomfort, the wholesale loss of privacy for prisoners housed with one, two, or three others in a forty-five foot cell or suffocatingly packed together in a crowded dormitory; the physical suffering and wretched psychological stress which must be endured by those sick or injured who cannot obtain adequate medical care; the sense of abject helplessness felt by inmates arbitrarily sent to solitary confinement or administrative segregation without proper opportunity to defend themselves or to argue their causes; the bitter frustration of inmates prevented from petitioning the courts and other government authorities for relief from perceived injustices.

*Id.* at 1390. Although the case is an old one, it merits mentioning, because as of 2001, Judge Justice held that despite many dramatic improvements in conditions, the Texas prison system was still in violation of the prohibition against cruel and unusual punishment with regard to "conditions of confinement in administrative segregation, failure to provide reasonable safety to inmates against abuse, and the excessive use of force by correctional officers." *Ruiz v. Johnson*, 154 F.Supp.2d 975, 1001 (S.D.Tex.2001).

### a. Violence at the Hands of Prison Officials

As the Committee Against Torture suggests, one of the most obvious human rights concerns in prisons is violence. Unlawful physical violence at the hands of prison guards certainly occurs, although for obvious reasons reliable statistics are hard to come by. The Court therefore cannot do much better than to provide a few recent examples. Two former prison guards at the Curran–Fromhold Correctional Facility recently received convictions and prison sentences for punching, kicking, and otherwise using excessive force

---

regarding facilities in Arkansas, Maryland, Nevada, and South Dakota. *Id.* Other states and territories that have received such letters in recent years include Georgia, Iowa, Kentucky, Louisiana, the Northern Mariana Islands, Puerto Rico, Tennessee, and Wyoming. *Id.*

**33.** Copies of these consent decrees and judgments can be found at http:// www.us-doj.gov/crt/split/findsettle.htm# Settlements.

against inmate Donti "Pumpkin" Hunter, and a former prison warden received a conviction and prison sentence for trying to cover up the beating. Jim Smith, *Mike McGrath: Exprison Guard Who Beat Inmate Gets Jail Term,* Phila. Daily News, Aug. 22, 2003, at 19, *available in* 2003 WL 56070813. Closer to home, a former jail guard and four other former officers at the Nashua Street Jail in Boston recently received convictions and prison sentences for their respective roles in the beating of a detainee awaiting trial. Ken Johnson, *Jail Guard Given Prison Sentence,* Patriot Ledger, Mar. 10, 2004, at 10, *available in* 2004 WL 62227844. Prison guards have also been convicted of organizing assaults on inmates at a federal prison in Florence, Colorado, and at Pelican Bay State Prison in Crescent City, California, a super-maximum ("supermax") facility. *See "Cowboy" Guards Must Remain in Jail, Judge Says,* Rocky Mountain News, July 3, 2003, at 32A, *available in* 2003 WL 6368342; Jaxon Van Derbeken & Susan Sward, *Probe of Chief's Son Called Unusual / Feds Rarely Intervene in Cases of Alleged Brutality by Police,* S.F. Chron., Dec. 7, 2003, at A29. Courts have also found more systemic violations in this regard. *See, e.g., Sheppard v. Phoenix,* 210 F.Supp.2d 450, 451–52 (S.D.N.Y.2002) (describing the stipulation and order of settlement in a case alleging a pattern of prison guard brutality). Even if the examples the Court provides are isolated incidents, they are cause for concern.

Sexual violence is also a serious problem. Female prisoners in particular have suffered sexual harassment, assault, and rape at the hands of prison guards. As of 1996, inmates in prisons for women were more likely than not to be guarded by men. Human Rights Watch, *All Too Familiar: Sexual Abuse of Women in U.S. State Prisons* ch. 1, *at* http://hrw.org/reports/1996/Us1.htm (Dec.1996) [hereinafter *All Too Familiar* ].[34] A Human Rights Watch report examining women's prisons in California, Georgia, Illinois, Michigan, New York, and Washington, D.C. states:

> We found that male correctional employees have vaginally, anally, and orally raped female prisoners and sexually assaulted and abused them. We found that in the course of committing such gross misconduct, male officers have not only used actual or threatened physical force, but have also used their near total authority to provide or deny goods and privileges to female prisoners to compel them to have sex or, in other cases, to reward them for having done so. In other cases, male officers have violated their most basic professional duty and have engaged in sexual contact with female prisoners absent the use or threat of force or any material exchange. In addition to engaging in sexual relations with prisoners, male officers have used mandatory pat-frisks or room searches to grope women's breasts, buttocks, and vaginal areas and to view them inappro-

---

**34.** Perversely, one reason that it is so common for men to be guarding female prisoners is that courts have frequently invoked the Civil Rights Act of 1964 to prohibit governmental and private employers from making guard hiring decisions based on gender. *All Too Familiar, supra,* at ch. 1. This may be a consequence of the difficulty that employers confront in amassing a sufficient record to demonstrate that gender-based hiring is justified in this situation. It also may be a consequence of the formalistic "gender-blind" analysis that courts increasingly apply to civil rights provisions in the federal Constitution and in federal statutes, an approach that studiously ignores the purposes behind the provisions and the context of gender-based power relations in society. For a discussion of the appropriate analysis to apply in cases involving hiring of prison guards based on gender, see *Torres v. Wisconsin Dep't of Health & Social Servs.,* 859 F.2d 1523, 1526–33 (7th Cir.1988).

priately while in a state of undress in the housing or bathroom areas. Male correctional officers and staff have also engaged in regular verbal degradation and harassment of female prisoners, thus contributing to a custodial environment in the state prisoners for women which is often highly sexualized and excessively hostile.

*Id.*

Although the law in all of these jurisdictions prohibits sexual misconduct of the kind described, Human Rights Watch reports that sexual misconduct is rarely investigated, much less punished, and that punishments tend to be light. *Id.* Human Rights Watch found internal administrative remedies to be largely ineffectual, with the officers accused of misconduct sometimes even investigating themselves. *Id.* Virtually every prison examined required the inmate to confront her abuser before filing a grievance, which made it unlikely that sexual misconduct would be reported. *Id.* It is difficult enough for a woman to confront her assailant outside of prison, and the fact that an accused prison guard and his colleagues can and frequently do retaliate against a prisoner who complains makes any report a tremendous act of courage.[35] *Id.; see* Human Rights Watch, *Nowhere To Hide: Retaliation Against Women in Michigan State Prisons* ch. 1, *at* http://www.hrw.org/reports98/women (July 1998) ("Virtually all of the women incarcerated in Michigan who were interviewed for *All Too Familiar* and who had lodged complaints of sex-

ual harassment or abuse have suffered some form of retaliation by the accused officer, his colleagues, or other inmates."). Studies estimate that nearly half of all female inmates suffer physical or sexual abuse sometime before their incarceration begins, so their continued exposure to such abuse recalls Judge Justice's statement about the effects of confinement on the mentally ill: "Then, in a tragically ironic twist, they may be confined in conditions that nurture, rather than abate, their psychoses." *Ruiz,* 37 F.Supp.2d at 915.

Other discussions of sexual assault on female inmates in this country have made observations similar to those in *All Too Familiar,* and have reached similar conclusions. *See* U.S. Gen. Accounting Office, *Women in Prison: Sexual Misconduct by Correctional Staff, at* http:// www.gao.gov/archive/1999/gg99104.pdf (June 1999) (focusing on staff-on-inmate misconduct in four U.S. correctional jurisdictions); *Report of the Special Rapporteur on Violence Against Women, Addendum: Report of the Mission to the United States of America on the Issue of Violence Against Women in State and Federal Prisons,* U.N. ESCOR, 55th Sess., Agenda Item 12, at 4, U.N. Doc. E/CN.4/1999/68/Add.2 (1999), *available at* http:// www.unhchr.ch/Huridocda/Huridoca.nsf/0/7560a6237c67bb118025674c004406e9?Opendocument; Amnesty International, *"Not Part of My Sentence": Violations of the Human Rights of Women in Custody at* http:// web.amnes-

---

**35.** As one might well expect, retaliation against prisoners who invoke their rights is a common problem. *See, e.g., Walker v. Bain,* 257 F.3d 660, 663 (6th Cir.2001) (noting a jury verdict for a plaintiff whose legal papers were confiscated in retaliation for filing grievances); *Gomez v. Vernon,* 255 F.3d 1118, 1127, 1131 (9th Cir.2001) (upholding a lower court's injunction protecting prisoners from retaliation from filing grievances or lawsuits); *Trobaugh v. Hall,* 176 F.3d 1087, 1088–89 (8th Cir.1999) (directing the award of compensatory damages for a prisoner placed in isolation for filing grievances); *Maurer v. Patterson,* 197 F.R.D. 244, 249 (S.D.N.Y.2000) (upholding a jury verdict for a prisoner who received a retaliatory disciplinary charge for complaining about the grievance program).

ty.org/library/Index/engAMR510011999 (Mar.1999).

Recent cases also confirm what these reports document.[36] In the first installment of the mid–1990s litigation brought by female inmates against the District of Columbia correctional system, the district court found that "there have been many instances of sexual misconduct between prison employees and female prisoners in all three of the women's facilities in this case," including "forceful sexual activity, unsolicited sexual touching, exposure of body parts or genitals and sexual comments." *Women Prisoners of Dist. of Columbia Dep't of Corr. v. District of Columbia*, 877 F.Supp. 634, 639 (D.D.C.1994) [hereinafter *Women Prisoners* ],[37] *vacated and modified in part on other grounds*, 899 F.Supp. 659 (D.D.C.1995), *rev'd in part and remanded on other grounds*, 93 F.3d 910 (D.C.Cir.1996), *cert. denied*, 520 U.S. 1196, 117 S.Ct. 1552, 137 L.Ed.2d 701 (1997), *on remand*, 968 F.Supp. 744 (D.D.C.1997) (order regarding sexual harassment, medical care, programs, environmental health, and fire safety); *see also Daskalea v. District of Columbia*, 227 F.3d 433, 441–42 (D.C.Cir.2000) (affirming a jury verdict of municipal deliberate indif-

ference to routine practice of sexual harassment of female inmates). In other litigation, the federal government has recently reached substantial settlements with the states of Arizona and Michigan regarding sexual misconduct and privacy violations that female inmates have suffered at the hands of prison guards.[38] *See United States v. Michigan*, No. 97–CVB–71514–BDT (E.D.Mich. Aug. 17, 1999) (consent decree); *United States v. Arizona*, No. 97–476–PHX–ROS (D.Ariz. Mar. 11, 1999) (consent decree).[39]

Rape of female inmates by male officers was one of many constitutional violations addressed by consent decrees in *Cason v. Seckinger*, 231 F.3d 777 (11th Cir.2000), which challenged conditions in the Georgia prison system. *See Cason*, 231 F.3d at 779 & nn. 2–4. The suit was filed by male prisoners in 1984, and female prisoners were brought into the action in 1992. Ellen Lord, *Lawsuit Over Prisons Terminated*, Macon Telegraph, Aug. 10, 2001, at 2, *available in* 2001 WL 25431971. Over 200 female inmates claimed to be victims of sexual misconduct. *Id.* In response to the suit, the Georgia Department of Corrections has added two more female prisons, reduced the ratio of male officers to female inmates, and improved mental health and counseling services. *Id.* Consent decrees in the case addressed such things as use of

**36.** Two important early cases regarding sexual abuse of female inmates should be noted. *See LaMarca v. Turner*, 995 F.2d 1526, 1544 (11th Cir.1993) (upholding the portion of a district court's injunction that required Florida's Glades Correctional Institution to train personnel in handling rape complaints, provide special training for the staff psychiatrist and staff psychologist, and promulgate procedures for the referral of rape victims for evaluations); *Jordan v. Gardner*, 986 F.2d 1521, 1530–31 (9th Cir.1993) (en banc) (affirming the district court's holding that the psychological harm inflicted by cross-gender clothed body searches of inmates at a women's prison constituted cruel and unusual punishment).

**37.** The court also described deprivations in the areas of medical care, living conditions,

fire safety, and access to prison programs on an equal basis, *Women Prisoners*, 877 F.Supp. at 643–62, and held that virtually all of them violated constitutional or statutory standards, *id.* at 664–79. The Court of Appeals by and large affirmed, except as to claims based on District of Columbia law and as to some of the claims based on unequal access to prison programs. *Women Prisoners*, 93 F.3d at 932.

**38.** In the text of the consent agreements, the states deny that they are guilty of any wrongdoing, and maintain that they are settling to avoid the costs of litigation.

**39.** Copies of both agreements can be found at http://www.usdoj.gov/crt/split/findsettle.htm# Settlements.

force, physical restraints, seclusion, stripping, and investigation, training, and counseling regarding sexual harassment and abuse. *Cason,* 231 F.3d at 779 nn. 3–4.

The Federal Bureau of Prisons' recent $500,000 settlement in *Lucas v. White,* 63 F.Supp.2d 1046 (N.D.Cal.1999), provides another example. In that case, three female inmates housed in the Federal Detention Center at Pleasanton, California alleged that prison guards deliberately exposed them to sexual abuse by male inmates. *Lucas,* 63 F.Supp.2d at 1050; Nina Siegal, *Stopping Abuse in Prison, The Progressive,* Apr. 1, 1999, at 31, *available in* 1999 WL 3680419. The settlement included institutional reform as well as money damages. Both on the national level and within the Pleasanton facility, the federal government agreed to the establishment of a training program to prevent sexual assault of female prisoners, provision of psychological and medical services for sexual assault victims, revision and amendment of the program statement for victims of sexual assault, adoption of measures to protect victim confidentiality, and comprehensive monitoring of these reforms. *Lucas,* 63 F.Supp.2d at 1051.

Locally, the Suffolk County Sheriff's Department just settled a lawsuit with a former female inmate who alleged she was coerced into having sex with three prison guards, one of whom fathered her child. *See* Settlement Order of 3/18/04 [Doc. No. 84] in *Doe v. Rouse,* Civ. A. No. 01–CV–10625–WGY (D. Mass. filed Apr. 13, 2001); Shelley Murphy, *Former Inmate, Sheriff Settle Suit: Department Will Pay $675,000 in Case,* Boston Globe, Mar. 17, 2004, at B5, *available in* 2004 WL 59777318. Given that the case was before this Court, and that the defendants admitted to no wrongdoing, it would be inappropriate to comment on the merits, but the Court notes that as a result of the incident,

Massachusetts passed a law criminalizing sexual contact between prison guards and inmates. Murphy, *supra; see* Mass. Gen. Laws ch. 268, § 21A. At the time the statute was passed, Massachusetts was one of thirteen states that had yet to pass such a law. Murphy, *supra.*

#### b. Inmate–on–Inmate Violence

Perhaps more common than prison guard violence is inmate-on-inmate violence. In 2000, 34,355 inmate-on-inmate assaults were reported. James J. Stephan & Jennifer C. Karberg, Bureau of Justice Statistics, *Census of State and Federal Corrections Facilities, 2000,* at v, *at* http://www.ojp.usdoj.gov/bjs/pub/pdf/csfcf00. pdf (Aug.2003) [hereinafter *Census of State and Federal Corrections Facilities* ]. In 1996, 14% of jail inmates reported having been in a fight, hit or punched since entering jail. *Profile of Jail Inmates, supra,* at 13. Higher estimates suggest that as many as 70% of all inmates are assaulted in a given year. *See Encyclopedia of American Prisons* 379 (Marilyn D. McShane & Frank P. Williams, III eds., 1996). Of the 3,175 inmate deaths during the year ending June 30, 2000, between one and three percent were homicides. *Census of State and Federal Corrections Facilities, supra,* at 8. The Court expects that, if anything, inmate-on-inmate violence is under-reported.

Particularly in male prisons, inmate-on-inmate rape is also a problem. *See generally* Human Rights Watch, *No Escape: Male Rape in U.S. Prisons,* at http://www.hrw.org/reports/2001/prison/report. html (last visited May 3, 2004). There is little information on the extent of the problem, in part because of the difficulty in getting reliable information about prison life, and in part because of the particular stigma that attaches to victims of rape, particularly homosexual rape. *Id.* ch. 7.

Estimates of the frequency of prison rape range from "rare" to "virtually universal," and empirical studies have suggested that somewhere between three and twenty percent of male prisoners have been sexually assaulted by fellow inmates. *Id.* ch. 7 & nn. 379–87. As with female inmate sexual assault complaints and with prisoner complaints about violence more generally, Human Rights Watch reports that prison systems typically lack adequate response mechanisms, and prosecutions for sexual assaults are rare. *Id.* ch. 8. Conditions may improve in the wake of the Prison Rape Elimination Act of 2003, Pub.L. No. 108–79, 111 Stat. 972, enacted last year to study the problem of prison rape and to provide funding and expertise to address it.

### c. Overcrowding

The prevalence of inmate-on-inmate violence is often a result of overcrowding. In 2002, the federal prison system was operating at 33% over capacity, and on average, states were reported to be operating at between one percent over their highest capacity and seventeen percent over their lowest, with only 24 states operating at below 100% of their highest operating capacity. *Prisoners in 2002, supra,* at 7.[40] Overcrowding is among the most common problems in cases holding prison conditions unconstitutional. *See, e.g., Tillery v. Owens,* 907 F.2d 418, 430–31 (3d Cir.1990) (upholding the district court's injunction against double-celling at the State Correctional Facility at Pittsburgh); *Inmates of Allegheny County Jail v. Wecht,* 874 F.2d 147 (3d Cir.1989) (affirming an order that the jail be closed), *vacated on other grounds,* 493 U.S. 948, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989); *Twelve John Does v. District of Columbia,* 855 F.2d 874, 874–75 (D.C.Cir.1988) (upholding the district court's contempt sanction, which was imposed when the District of Columbia exceeded limitations that a consent decree had placed on the number of inmates that could be housed at the Lorton Central facility); *French v. Owens,* 777 F.2d 1250 (7th Cir.1985) (affirming portions of the district court's judgment pertaining to overcrowding, double–celling, and medical care); *Wellman v. Faulkner,* 715 F.2d 269, 274 (7th Cir.1983) (concluding that the record supported the district court's finding that "[t]he most serious problem at the prison is simple overcrowding"); *Maynor v. Morgan County,* 147 F.Supp.2d 1185, 1186 (N.D.Ala.2001) (comparing county jail conditions to "the holding units of slave ships during the Middle Passage of the eighteenth century"); *Inmates of Suffolk County Jail v. Rufo,* 844 F.Supp. 31, 39 (D.Mass.1994) (Keeton, J.) (modifying a fifteen-year old consent decree regarding double bunking); *Inmates of Suffolk County Jail v. Rufo,* 148 F.R.D. 14, 25 (D.Mass.1993) (Keeton, J.) (holding that modification was not yet appropriate), *aff'd,* 12 F.3d 286 (1st Cir.1993); *Palmigi-*

---

**40.** Jurisdictions were asked to report on three types of capacity:

*Rated capacity* is the number of beds or inmates assigned by a rating official to institutions within the jurisdiction.

*Operational capacity* is the number of inmates that can be accommodated, based on a facility's staff, existing programs, and services.

*Design capacity* is the number of inmates that planners or architects intended for the facility.

*Prisoners in 2002, supra,* at 7. Many prison systems only reported on one or two kinds of capacity. *Id.* Rated and design capacity relate to overcrowding, whereas operational capacity refers to understaffing, but it is obvious that both increasing inmates' exposure to one another and failing to provide adequate supervision would tend to increase the incidence of inmate-on-inmate violence.

ano v. DiPrete, 737 F.Supp. 1257, 1262 (D.R.I.1990) (awarding, inter alia, good time credits to inmates to ensure prompt compliance with prison conditions consent decree regarding overcrowding and numerous other conditions of confinement); Duran v. Anaya, 642 F.Supp. 510, 526–27 (D.N.M.1986) (awarding a preliminary injunction to prevent statewide cuts in corrections staff, as the cuts were likely to lead to "[d]eath, extreme pain, self-mutilation, ... [and] increased rates of physical assault, rape, and other forms of violence").

### d. Degrading, Unhealthy, and Unsafe Conditions

In addition to overcrowding, courts have in many cases held that unsanitary, dangerous, or otherwise degrading conditions violate the Constitution. The Court discusses several such cases elsewhere in this opinion. See also, e.g., Hutto v. Finney, 437 U.S. 678, 685–88, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (upholding the district court's order forbidding confinement in punitive isolation cells for over 30 days, because in combination with existing conditions, isolation for longer than that period would constitute cruel and unusual punishment); Russell v. Johnson, No. 1:02–CV–261–JAD, 2003 WL 22208029, at *2–5 (N.D.Miss. May 21, 2003) (holding that numerous conditions in the Mississippi State Penitentiary's Death Row constituted cruel and unusual punishment, including filth and pest infestation in cells, unregulated temperature, plumbing that frequently resulted in an inmate's fecal matter bubbling up in another inmate's cell, poor lighting, foul-smelling laundry, and inadequate mental health services); Knop v. Johnson, 667 F.Supp. 467, 483–84, 496 (W.D.Mich.1987) (holding, inter alia, that forcing inmates "to live in close proximity to their bodily wastes" constituted cruel and unusual punishment); Toussaint v. McCarthy, 597 F.Supp. 1388, 1408–13 (N.D.Cal.1984) (holding that conditions at the California State Prisons at Folsom and San Quentin violated the Constitution in areas including double–celling, heating and ventilation, plumbing, lighting, noise, electrical systems, fire safety, clothing, laundry, bedding, personal hygiene, sanitation, pests, food, exercise, and access to courts), rev'd in part on other grounds, 801 F.2d 1080 (9th Cir.1986); Capps v. Atiyeh, 559 F.Supp. 894, 911–12, 914–15 (D.C.Or.1982) (holding that the conditions in Oregon prison facilities were in violation of constitutional standards regarding the provision of medical care, the processing of milk, and ensuring fire safety at the prison dairy farm).

### e. Inadequate Medical and Mental Health Care

Inadequate medical care is also a common problem. See, e.g., Plata v. Davis, 329 F.3d at 1101, 1103–05 (9th Cir.2003) (discussing two class actions alleging an inadequate medical care system in California prisons); Cameron v. Tomes, 783 F.Supp. 1511, 1525–27 (D.Mass.1992) (Keeton, J.) (holding that an individual committed to the Massachusetts Center for the Sexually Dangerous had a constitutional right under the Eighth and Fourteenth Amendments to be confined in "an environment where professional judgment can be exercised," and issuing an injunction to ensure such conditions), aff'd as modified, 990 F.2d 14, 21–22 (1st Cir.1993). In California, after a prisoner gave birth on the floor of a jail, with no medical assistance, three hours after informing guards that she was in active labor, and after lack of pregnancy-related medical care in various California facilities led to numerous prisoners having deformed or stillborn babies, lawsuits and consent decrees brought improved conditions. See Ellen M. Barry,

*Bad Medicine: Health Care Inadequacies in Women's Prisons*, 16 Crim. Justice 38, 40 (Spr.2001); Susan Stefan, *Whose Egg Is It Anyway? Reproductive Rights of Incarcerated, Institutionalized and Incompetent Women*, 13 Nova L.Rev. 405, 442–43 (1989) (citing *Yeager v. Smith*, No. CV–F–87–493 (E.D. Cal. filed Sept. 2, 1987), *Harris v. McCarthy*, No. 85–6002–WMB (C.D. Cal. filed Sept. 11, 1985), and *Jones v. Dyer*, No. H–114514–0 (Cal.Super. Ct. filed Feb. 25, 1986)).

In 1992, a federal court awarded inmates at thirteen Pennsylvania correctional facilities a preliminary injunction requiring immediate implementation of control and treatment measures for a tuberculosis epidemic in those facilities. *Austin v. Pennsylvania Dept. of Corr.*, No. 90–7497, 1992 WL 277511, at *8 (E.D.Pa. Sept.29, 1992). Testing done pursuant to that injunction revealed that in one jail alone, 400 inmates were infected. Anthony Lewis, *Cruel and Unusual, Balt. Evening Sun*, Feb. 20, 1995, at 11A.

Prisoners also often receive inadequate mental health treatment, but prison lawsuits have led to improvements in mental health care in many states, including Alabama, Arizona, California, Florida, Indiana, Iowa, Louisiana, Michigan, New Mexico, New Jersey, New York, Ohio, Texas, Vermont, Washington, and Wisconsin. *Ill–Equipped, supra*, ch. 6. Not too long ago, a federal court determined that the California prison system's failure to implement "a systematic program for screening and evaluating inmates for mental illness" violated the constitutional prohibition against cruel and unusual punishment. *Coleman v. Wilson*, 912 F.Supp. 1282, 1306 (E.D.Cal.1995). The court also held that inadequate training of personnel led to inappropriate application of punitive measures (particularly administrative segregation and use of tasers and 37 millime-

ter guns) to mentally ill inmates, again in violation of constitutional standards. *Id.* at 1320–23. *See also, e.g., D.M. v. Terhune*, 67 F.Supp.2d 401, 411 (D.N.J.1999) (approving settlement of a class action challenging the adequacy of mental health treatment for inmates); *Goff v. Harper*, 59 F.Supp.2d 910, 922–24 (S.D.Iowa 1999) (approving, in substantial part, the state's fourth proposed plan to address mental health violations), *remanded on other grounds*, 235 F.3d 410 (8th Cir.2000); *Dunn v. Voinovich*, Case No. C1–93–0166 (S.D.Ohio 1995).

### f. Special Concerns Regarding Children

Cruel, unusual, and degrading conditions of confinement fall especially hard on children, and litigation has been necessary to curb serious abuses. For example, in Boise, Idaho, a 17–year–old boy in jail for failing to pay $73 in parking fines was beaten and ultimately murdered by other prisoners over a 14–hour period spent in the cell. Ronald Weich, American Civil Liberties Union, *Upsetting Checks and Balances: Congressional Hostility Toward the Courts in Times of Crisis* 38, at http:// archive.aclu.org/congress/courtstripping.pdf (Oct.2001). Another teenager had been beaten unconscious by the same inmates several days earlier. *Id.* In three years, over 6,250 children had been held in the jail, most for minor offenses. *Id.* Litigation ultimately led to a consent decree addressing these problems. *See Yellen v. Ada County*, No. 83–1026 (D.Idaho 1985) (consent decree).

In 2000, a federal court approved a settlement agreement against the South Dakota Training School at Plankinton, where incarcerated children alleged Eighth Amendment violations based on excessive use of force, excessive and unreasonable use of restraints, arbitrary disciplinary

procedures and policies (including excessive lockdown and isolation), inadequacy of health care and education, and privacy violations. *Christina A. v. Bloomberg*, No. Civ. 00–4036, 2000 WL 33980011, at *1–4, (D.S.D. Feb.24, 2000).

### g. Special Concerns Regarding "Supermax" Facilities

Finally, the various conditions described above may be even more common in certain types of prison. In particular, as of 2000, more than twenty thousand prisoners, roughly two percent of the prison population, were housed in "supermax" facilities or units, many of which raise serious concerns. Human Rights Watch, *Out of Sight: Super–Maximum Security Confinement in the United States* ch. 1, at http:// www.hrw.org/reports/2000/supermax (Feb.2000) [hereinafter *Out of Sight*]. The National Institute of Corrections defines a supermax prison as:

> A freestanding facility, or a distinct unit within a freestanding facility, that provides for the management and secure control of inmates who have been officially designated as exhibiting violent or seriously disruptive behavior while incarcerated. Such inmates have been determined to be a threat to safety and security in traditional high-security facilities and their behavior can be controlled only by separation, restricted movement, and limited access to staff and other inmates.

Chase Riveland, Nat'l Institute of Corrections, *Supermax Prisons: Overview and General Considerations* 3, at http://www.nicic.org/pubs/1999/014937.pdf (Jan. 1999).

Life in such facilities has been described as follows:

Prisoners in these facilities typically spend their waking and sleeping hours locked in small, sometimes windowless, cells sealed with solid steel doors. A few times a week they are let out for showers and solitary exercise in a small, enclosed space. Supermax prisoners have almost no access to educational or recreational activities or other sources of mental stimulation and are usually handcuffed, shackled and escorted by two or three correctional officers every time they leave their cells. Assignment to supermax housing is usually for an indefinite period that may continue for years. Although supermax facilities are ostensibly designed to house incorrigibly violent or dangerous inmates, many of the inmates confined in them do not meet those criteria.

*Out of Sight, supra,* ch. 1; *see also* Amnesty International, *Abuses Continue Unabated? Cruel and Inhumane Treatment at Virginia Supermaximum Security Prisons,* at http://web.amnesty.org/library/Index/eng AMR510652001!Open (May 2001); Human Rights Watch, *Cold Storage: Super–Maximum Security Confinement in Indiana,* at http://www.hrw.org/reports/1997/usind (last visited March 22, 2004) (Oct.1997); Human Rights Watch, *Red Onion State Prison: Super–Maximum Security Confinement in Virginia,* at http://www.hrw.org/reports/1999/redonion (Apr.1999).

In 1995, officials at the three facilities at Pelican Bay State Prison in California (a supermax facility) were found to have engaged in extensive and horrific Eighth Amendment violations in the areas of use of force, medical and mental health care, and general living conditions (particularly cell housing practices). *See Madrid v. Gomez*, 889 F.Supp. 1146, 1280 (N.D.Cal. 1995).[41] The *Madrid* opinion is one of the

---

41. Other lawsuits challenging conditions in supermax facilities have led to consent de-

longest this Court has ever encountered, so rather than summarizing it, the Court simply recounts a typical incident in the *Madrid* court's description of "a conspicuous pattern of excessive force." *Id.* at 1161. A diminutive, nonviolent, and non-threatening inmate refused to return his food tray after a correctional officer insulted him. *Id.* at 1162. In response, several officers fired two rounds from a 38 millimeter gas gun into the cell; fired a taser gun, hitting the inmate in the chest and stomach; hit him on the head with the butt of the gas gun and knocked him unconscious; stepped on his hands and beat him on the calves with a baton while he was unconscious; again beat him into unconsciousness when he came to; and dragged him out of the cell face-down, at which point his head was bleeding and a piece of his scalp had been detached or peeled back. *Id.*

### 3. Constitutional Standards, International Legal Standards, and Interpretive Presumptions

Both United States constitutional law and international human rights law prohibit many of the conditions described above. These prohibitions have been enforced through solicitude for prisoners' claims and through application of interpretive presumptions favoring prisoners.

#### a. The Eighth and Fourteenth Amendments

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." U.S. Const. amend. VIII.[42] This prohibition applies to the states via the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The Eighth Amendment has long been

---

crees and, ultimately, to improvements. In 2001, a Wisconsin federal court awarded a preliminary injunction requiring that mentally ill inmates not be housed at the Supermax Correctional Facility in Boscobel, Wisconsin, upon a finding that the inmate plaintiffs had demonstrated a sufficient likelihood of "showing that the very fact of housing any seriously mentally ill inmates at Supermax constitutes cruel and unusual punishment." *Jones 'El v. Berge*, 164 F.Supp.2d 1096, 1122, 1125 (W.D.Wis.2001). The case was ultimately resolved through a settlement agreement. 2002 WL 32362655, at *1 (W.D.Wis. Sept.18, 2002) (noting that judgment was entered after a settlement agreement was recorded).

A lawsuit challenging conditions at the Ohio State Penitentiary apparently prompted state officials to make changes in the areas of medical care, mental health, and outdoor recreation. Marilyn Miller, *Warden Defends Prison Security; ACLU Lawsuit Claims Isolation at Penitentiary Is Too Extreme, Cruel, Akron Beacon Journal*, Jan. 10, 2002, at D3, *available in* 2002 WL 6722633. The Ohio Court later held that conditions at the facility were such that prisoners had a liberty interest in avoiding transfer there, and that the prison system's procedures for making transfer deci-

sions violated the Due Process Clause of the Fourteenth Amendment. *See Austin v. Wilkinson*, 189 F.Supp.2d 719, 754 (N.D.Ohio 2002); *see also Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (holding that a state prisoner could not succeed in a Section 1983 suit alleging violation of state prison regulations, unless the violation led to restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"). A settlement in the *Austin* case was later approved by the Sixth Circuit. *See* 83 Fed. Appx. 24 (6th Cir.2003) (unpublished table decision). (The Court recognizes that in the Sixth Circuit, unpublished opinions are binding only on the parties to the case, 6 Cir. R. 28(g); *United States v. Webber*, 208 F.3d 545, 551 n. 3 (6th Cir.2000), and cites *Austin* merely as confirmation that settlement was reached in that case.)

**42.** For discussions of the history of this constitutional provision, see *Gregg v. Georgia*, 428 U.S. 153, 169–73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.), and *Furman v. Georgia*, 408 U.S. 238, 316–28, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring).

understood to prohibit physical torture, although definitions of "torture" are obviously contested. *See Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (citing *Wilkerson v. Utah*, 99 U.S. 130, 136, 25 L.Ed. 345 (1878), and *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890)).[43] It does more than this, however; it " 'embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ,' against which we must evaluate penal measures." *Id.* (alteration in original) (quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir.1968)). It therefore prohibits punishments that are incompatible with "the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958),[44] or that "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

The Supreme Court has thus held that the authority administering a prison must provide adequate medical care to inmates. *Gamble*, 429 U.S. at 103, 97 S.Ct. 285. Thus, "deliberate indifference to the serious medical needs of prisoners" violates "contemporary standards of decency as manifested in modern legislation," which prohibit the "infliction of . . . unnecessary suffering" that denial of adequate medical care would entail. *Id.* at 103–04 & nn. 8–9, 97 S.Ct. 285 (describing the confirmations of this principle in common law, statutes, and model statutes).

The "deliberate indifference" standard applies more broadly to actions or omissions that create "a substantial risk of serious harm to an inmate." *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see Helling v. McKinney*, 509 U.S. 25, 32–33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (holding that the deliberate indifference standard applies to unhealthy prison conditions, even if they have not yet caused harm); *Wilson v. Seiter*, 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (holding that the "deliberate indifference" standard applies equally to "inhumane conditions of confinement" and inadequate medical care); *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) ("Conditions other than those in *Gamble* and *Hutto* [*v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) ], alone or in combination . . . could be cruel and unusual under the contemporary standards of decency we recognized in *Gamble*." (citation omitted)). As the Supreme Court stated in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989):

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and well-being. . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his

---

**43.** Although neither is involved here, the Court notes that the Eighth Amendment also prohibits punishments grossly disproportionate to a crime's severity, *e.g.*, *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910), and places limits on what can be criminalized and punished, *e.g.*, *Robinson*, 370 U.S. at 666–67, 82 S.Ct. 1417.

**44.** *See also Gregg*, 428 U.S. at 172–73, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.); *Weems v. United States*, 217 U.S. 349, 373, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits set on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* at 199–200, 109 S.Ct. 998.

■ Whatever the nature of the challenged conduct may be, the required showing to make out an Eighth Amendment violation has two elements. The objective component asks whether a deprivation suffered by a prisoner is sufficiently serious that it denies "the minimal civilized measure of life's necessities." *Wilson,* 501 U.S. at 298, 111 S.Ct. 2321 (quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392). The second, subjective component asks whether the officials in question "act[ed] with a sufficiently culpable state of mind." *Id.* at 298–99, 111 S.Ct. 2321 (citing *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). The official must be guilty not merely of ordinary negligence, *Gamble,* 429 U.S. at 105–06, 97 S.Ct. 285, but of "*obduracy and wantonness.*" *Wilson,* 501 U.S. at 299, 111 S.Ct. 2321 (quoting *Whitley,* 475 U.S. at 319, 106 S.Ct. 1078) (internal quotation marks omitted). "[I]n this context wantonness does not have a fixed meaning but must be determined 'with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.'" *Id.* at 302, 111 S.Ct. 2321 (quoting *Whitley,* 475 U.S. at 320, 106 S.Ct.

1078). Thus, whereas actions taken by a prison official in certain emergency contexts would have to be taken "maliciously and sadistically for the very purpose of causing harm" to violate the Eighth Amendment, failure to provide medical care need only meet the "deliberate indifference" standard. *Id.* at 302, 111 S.Ct. 2321 (quoting *Whitley,* 475 U.S. at 320–21, 106 S.Ct. 1078) (internal quotation marks omitted).

■ When "deliberate indifference" is the required state of mental culpability:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837, 114 S.Ct. 1970.

**b. International Legal Standards, as Incorporated into Federal Common Law**

**i. Treaties**

International law also places limits on the suffering that can be imposed on prisoners, and requires states to provide a remedy for violations of prisoners' human rights.[45] The United States is a party to

---

**45.** A more complete examination of the role of international law in domestic prisoners' rights cases might well require a discussion of the international legal prohibitions against discrimination on the basis of race and other immutable or quasi-immutable characteristics, given the high proportion of members of marginalized groups in the prison population. Along these lines, the Court notes that the prohibition against racial discrimination has been affirmed in many treaties, undoubtedly has the status of customary international law and *jus cogens,* and places greater affirmative

obligations on government than does the Equal Protection Clause of the Fourteenth Amendment to remedy past discrimination and to avoid actions that unnecessarily produce a disparate impact on racial minorities. *See, e.g.,* U.N. Charter art. 1, paras. 2–3; American Convention on Human Rights, Nov. 22, 1969, 1144 U.N.T.S. 123 (1978); International Convention on the Elimination of All Forms of Racial Discrimination, Dec. 21, 1965, G.A. Res. 2106 A(XX), 660 U.N.T.S. 195 (1969); American Declaration of the Rights

treaties that forbid torture and cruel or unusual punishment of any person, prisoner or otherwise, and that require provision of adequate remedies for treaty violations. *See, e.g.,* Convention Against Torture, *supra;* International Covenant on Civil and Political Rights, Dec. 16, 1966, arts. 7, 10, G.A. Res. 2200A (XXI), U.N. GAOR, 21st Sess., Supp. No. 16, at 51, U.N. Doc. A/6316, 999 U.N.T.S. 171, *available at* http:// www.unhchr.ch/html/menu3/b/a_ ccpr.htm [*hereinafter* ICCPR].[46]

■ Treaties are as legally binding as federal statutes, and if a treaty and a federal statute conflict, the later in time is controlling. *See United States v. Dion,* 476 U.S. 734, 738, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986); *Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 252, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984); *Chae Chan Ping v. U.S.,* 130 U.S. 581, 600, 602–03, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888); *Edye v. Robertson (Head Money Cases),* 112 U.S. 580, 597–99, 5 S.Ct. 247, 28 L.Ed. 798 (1884). At the same time, a treaty can only be directly applied in a case if it is self-executing—that is, if its provisions "act directly" on the issues in question,

rather than merely "pledge the faith of the United States to pass acts which shall ratify and confirm them." *Foster v. Neilson,* 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829), *overruled in part on other grounds, United States v. Percheman,* 32 U.S. (7 Pet.) 51, 89, 8 L.Ed. 604 (1833). If the treaty is non-self-executing, it "addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court." *Foster,* 27 U.S. (2 Pet.) at 254.

■ Even when a treaty is not self-executing, courts must strive not to interpret statutes to conflict with the international obligations expressed in such a treaty. *See Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ."); *see also MacLeod v. United States,* 229 U.S. 416, 434, 48 Ct.Cl. 512, 33 S.Ct. 955, 57 L.Ed. 1260 (1913) ("The statute should be construed in the light of the purpose of the government to act within the limitation of the principles of international law, . . . and it should not be assumed that Congress proposed to violate

and Duties of Man, Mar. 30–May 2, 1948, O.A.S. Res. XXX, O.A.S. Off. Rec. OEA/ Ser/.L./V/I.4 Rev (1965); Universal Declaration of Human Rights, Dec. 10, 1948, G.A. Res. 217A (III), U.N. GAOR, 3d Sess., Pt. 1, at 71, U.N. Doc. A/810; Barcelona Traction, Light & Power Co., (Belg.v.Spain), 1970 I.C.J. 3, 32 (Feb. 5) (noting that international law has outlawed racial discrimination, and that the obligation not to engage in such discrimination is an obligation *erga omnes* ); Restatement (Third) of the Foreign Relations Law of the United States §§ 302, 702 & cmt. n (1987); Richard Lillich, *Civil Rights, in* 2 *Human Rights in International Law* 115, 133, 151 (Thedor Meron ed., 1984).

Yet because other international legal norms and domestic constitutional norms provide

adequate grounds for decision in this case, the Court leaves further discussion for another day. Similarly, the Court does not discuss the numerous instruments dealing with the rights of women, children, the mentally ill, and other groups, which include rights against torture and cruel or unusual punishment, because the more general materials discussed are sufficient to establish the status of these rights as applied to all people.

**46.** The United States ratified the ICCPR subject to a declaration of non-self-execution. Anne Bayefsky & Joan Fitzpatrick, *International Human Rights Law in United States Courts: A Comparative Perspective,* 14 Mich. J. Int'l L. 1, 42 (1992).

the obligations of this country to other nations ....."); *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 260–61, 1 L.Ed. 568 (1796) (Iredell, J.) (stating the principle that statutes should not be interpreted to violate international legal obligations); Restatement (Third) of the Foreign Relations Law of the United States [hereinafter "Restatement"] § 114.[47]

### ii. Customary International Law

■■■■ There is little doubt that the prohibitions against torture and cruel or unusual punishment and the requirement that remedies be provided for violations of prisoners' human rights have become customary international law. *See Filartiga v. Pena–Irala*, 630 F.2d 876, 881–82 (2d Cir. 1980) (referring to the ban on torture as "part of customary international law"); Restatement, *supra*, § 702.[48] A norm "crystallizes," or becomes binding as customary international law, when there is sufficient state practice consistent with it, and when there is *opinio juris*—that is, states follow the norm out of a sense of legal obligation. *See* Statute of the International Court of Justice art. 38, 59 Stat. 1031, T.S. No. 993 (1945); Restatement,

*supra*, § 102; Ian Brownlie, *Principles of Public International Law* 4–11 (5th ed.1999). Courts can determine the content of customary international law not only by looking to state practice, but by examining, as "trustworthy evidence of what the law really is," "the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat." *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); Restatement (Third) of the Foreign Relations Law of the United States §§ 102–03 (1987).

The treaties mentioned above constitute both state practice and evidence of *opinio juris*. So do a number of nontreaty human rights instruments and United Nations General Assembly Resolutions, many of which the United States has approved. *See* Universal Declaration of Human Rights, Dec. 10, 1948, arts. 2, 5–6, 8, G.A. Res. 217A (III), U.N. GAOR, 3d Sess., Pt. 1, at 71, U.N. Doc. A/810; Standard Minimum Rules for the Treatment of Prisoners, Aug. 30, 1955, E.S.C. Res. 663C, 24 U.N. ESCOR Supp. (No. 1) at 11, U.N. Doc. A/CONF/611 [hereinafter "Standard

---

**47.** *See also In re Weitzman*, 426 F.2d 439, 461 (8th Cir.1970) (Heaney, J., concurring) (referring to the principle established by the Nuremberg trials and the Universal Declaration of Human Rights in interpreting the statutory term "conscience"); *Lareau v. Manson*, 507 F.Supp. 1177, 1189, 1192–93 & nn. 9, 18 (D.Conn.1980) (looking to the United Nations' Standard Minimum Rules for the Treatment of Prisoners and other international legal sources in determining that prison overcrowding had risen to a level that violated the Eighth Amendment), *aff'd in part and modified in part*, 651 F.2d 96 (2d Cir.1981); *Rodriguez Fernandez v. Wilkinson*, 505 F.Supp. 787, 795–800 (D.Kan.1980), (granting a writ of habeas corpus on the ground that the petitioner's detention violated international law), *aff'd* 654 F.2d 1382, 1388 (10th Cir.1981) ("It seems proper then to consider international

law principles for notions of fairness as to propriety of holding aliens in detention.").

**48.** *See also Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1149–50 (7th Cir. 2001); *United States v. Matta–Ballesteros*, 71 F.3d 754, 764 n. 5 (9th Cir.1995) (citing *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939–40 (D.C.Cir.1988), and *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir.1992)); *Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322, 1344 (N.D.Ga.2002); *Taveras–Lopez v. Reno*, 127 F.Supp.2d 598, 609 (M.D.Pa.2000); *White v. Paulsen*, 997 F.Supp. 1380, 1383 (E.D.Wash.1998); *Xuncax v. Gramajo*, 886 F.Supp. 162, 183 n. 25 (D.Mass. 1995) (Woodlock, J.); *Paul v. Avril*, 901 F.Supp. 330, 335 (S.D.Fla.1994); Restatement, *supra*, §§ 102, 702 & cmt. n.

Minimum Rules"] (cited with approval in *Gamble*, 429 U.S. at 103 n. 8, 97 S.Ct. 285); [49] Code of Conduct for Law Enforcement Officials, Dec. 17, 1979, arts. 1–2, 5–6, G.A. Res. 34/169, U.N. GAOR, 34th Sess., Supp. No. 46, at 186, U.N. Doc. A/34/46 [hereinafter "Code of Conduct"] (adopted by consensus, without a vote); [50] Basic Principles for the Treatment of Prisoners, Dec. 14, 1990, Principle 1, G.A. Res. 45/111, U.N. GAOR, 45th Sess., Supp. No. 49A, at 199, U.N. Doc. A/45/49; Principles of Medical Ethics Relevant to the Role of Health Personnel, Particularly Physicians, in the Protection of Prisoners and Detainees Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Dec. 18, 1992, G.A. Res. 37/194, U.N. GAOR, 37th Sess., Supp. No. 51, U.N. Doc. A/37/194; Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Dec. 9, 1998, Principle 1, G.A. Res. 43/173, U.N. GAOR, 43d Sess., Supp. No. 49, U.N. Doc. A/43/49 [hereinafter "Body of Principles"] (approved by consensus, without a vote); [51] *id.* Principle 6 & n.* (prohibiting torture and "cruel, inhuman or degrading treatment," and requiring interpretation of the latter phrase "so as to extend the widest possible protection against abuses, whether physical or mental, including the holding of a detained or imprisoned person in conditions which deprive him, temporarily or permanently, of the use of any of his natural senses, such as sight or hearing, or of his awareness of place and the passing of time").

United Nations member states are now required to report to the Secretary General on implementation of the Standard Minimum Rules, *see* Suzanne M. Bernard, *An Eye for an Eye: The Current Status of International Law on the Humane Treatment of Prisoners*, 25 Rutgers L.J. 759, 774 & n. 91 (1994) (citing Committee on Crime Prevention and Control, Procedures for the Effective Implementation of the Standard Minimum Rules for the Treatment of Prisoners, May 25, 1984, E.S.C. Res.1984/47, U.N. ESCOR, 76th Sess., Supp. No. 1, at 29, U.N. Doc. E/1984/84), and their compliance with that mandate constitutes both relevant practice and evidence of *opinio juris.* Even as of the Secretary General's first inquiry in 1984, forty states reported that they had implemented the rules, eleven reported partial implementation, and only one reported no implementation. *Id.* at 774 (citing *Implementation of the United Nations Standard Minimum Rules for the Treatment of Prisoners, Report of the Secretary General* 6–7, 12, May 31, 1983, U.N. Doc. A/CONF. 121/15).[52] As early as 1980, 68

---

**49.** *See also* G.A. Res. 3144, Dec. 14, 1973, U.N. GAOR, 28th Sess., Supp. No. 30, at 85 (calling on member states to incorporate the Standard Minimum Rules into domestic penal law); G.A. Res. 2858, Dec. 20, 1971, U.N. GAOR, 26th Sess., Supp. No. 29, at 94 (same).

**50.** Suzanne M. Bernard, *An Eye for an Eye: The Current Status of International Law on the Humane Treatment of Prisoners*, 25 Rutgers L.J. 759, 776 (1994).

**51.** *See id.* at 777. "Law enforcement officials" includes those who exercise "powers of detention." Code of Conduct, *supra*, at art. 1, cmt. a.

**52.** In this country, principles of the Standard Minimum Rules were incorporated into the 1962 Model Penal Code and the correctional standards developed in 1973 by the National Advisory Commission on Criminal Justice Standards and Goals. Bernard, *supra*, at 774 & n. 98 (1994) (citing Daniel L. Skoler, World Implementation of the United Nations Standard Minimum Rules for the Treatment of Prisoners, 10 J. Int'l L. & Econ. 453, 460 (1975)). The Standard Minimum Rules have directly influenced penal laws in states such as Connecticut, Illinois, Minnesota, Ohio, Pennsylvania, and South Carolina. *Id.* at 774–75 & nn. 99–101 (citing Skoler, *supra*, at 462).

national constitutions expressly afforded prisoners the right to be treated with dignity and humanity. *See* Bernard, *supra*, at 788 & n. 175 (citing M. Cherif Bassiouni, *The Protection of Human Rights in the Criminal Process Under International Instruments and National Constitutions* 91 & chart 5 (1981)).

The reports and proposals issued from international bodies convened to discuss the problems of torture and cruel or unusual punishment provide further evidence of customary law. For example, the United Nations Congress on the Prevention of Crime and the Treatment of Offenders convenes every five years, has issued numerous proposals to address these problems (including the Standard Minimum Rules), and has unanimously recognized that the Standard Minimum Rules should apply to all prisoners in all states. *See* Bernard, *supra*, at 780 & nn. 130–34.

Regional conventions and treaties mirror international developments, and further confirm the crystallization of customary international law.[53] The same can be said of a number of model regional standards.[54]

The Court also looks to the activities of nongovernmental actors. They play an increasingly important role in international standard setting, and their activities provide evidence of emerging customary norms, although such activities are less relevant than those of state actors. Organizations such as Amnesty International,

the Commission of the Churches on International Affairs of the World Council of Churches, Human Rights Watch, the International Association of Educators for World Peace, the International Committee of the Red Cross, the International Council for Adult Education, the International Federation of Human Rights, the International Prisoners' Aid Association, and the World Council of Indigenous Peoples have consistently advocated for the right of prisoners to be free from torture and cruel or unusual punishment, and to have remedies for violations of that right, and have strongly influenced the development of international standards. *See id.* at 781 & nn. 137–41.

Like other human rights obligations, the prohibition against torture and cruel or unusual punishment and the requirement that remedies be provided for violations are obligations *erga omnes*, in which, "[i]n view of the importance of the rights involved, all States can be held to have an interest." Barcelona Traction, Light & Power Co., (Belg.v.Spain), 1970 I.C.J. 3, 32 (Feb. 5). In addition, as *jus cogens* norms, these obligations are "nonderogable and peremptory, enjoy the highest status within customary international law, are binding on all nations, and can not be preempted by treaty." *United States v. Matta–Ballesteros*, 71 F.3d 754, 764 n. 5 (9th Cir. 1995) (citing *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939–40 (D.C.Cir.1988), and

---

**53.** *See, e.g.*, American Convention on Human Rights arts. 5, 25, Nov. 22, 1969, 1144 U.N.T.S. 123 (1978); European Convention for the Protection of Human Rights and Fundamental Freedoms art. 3, Nov. 4, 1950, 213 U.N.T.S. 221 (1953); African Charter on Human and Peoples' Rights art. 5, June 27, 1981, OAU Doc. CAB/LEG/67/3 Rev. 5, 21 I.L.M. 58 (1982); Inter–American Convention to Prevent and Punish Torture, Dec. 9, 1985, O.A.S. Treaty Series No. 67; European Con-

vention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, Nov. 26, 1987, 27 I.L.M. 1152 (1988).

**54.** *See, e.g.*, Committee of Ministers, Council of Europe, European Prison Rules, Recommendation No. R(87)3 (1987); American Declaration of the Rights and Duties of Man, Mar. 30–May 2, 1948, O.A.S. Res. XXX, O.A.S. Off. Rec. OEA/Ser/. L/V/I.4 Rev (1965).

*Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 717 (9th Cir.1992)).[55]

■■■ Customary international law is also binding on federal courts, as part of federal common law. As the United States Supreme Court observed long ago: "International law is part of our law, and must be ascertained by the courts .... [W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations ...." *Paquete Habana,* 175 U.S. at 700, 20 S.Ct. 290;[56] *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 623, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("[T]he principles governing this case are common to both international law and federal common law, which in these circumstances is necessarily informed both by international law principles and by articulated congressional policies); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483, *passim* (1832) (grounding its decision in the law of nations); *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25, *passim* (1831) (same); *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681, *passim* (1823) (same); *United States v. Smith,* 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820) (determining and applying the "law of nations" regarding piracy); *The Nereide,* 13 U.S. (9 Cranch) 388, 423, 3 L.Ed. 769 (1815) ("Till [a contrary federal statute] be passed, the Court is bound by the law of nations which is a part of the law of the land."); *Ware,* 3 U.S. (3 Dall.) at 281 (Wilson, J.) ("When the United States declared their independence, they were bound to receive the law of nations, in its modern state of purity and refinement.");[57] *Talbot v. Jansen,* 3 U.S. (3 Dall.) 133, 161, 1 L.Ed. 540 (1795) (Iredell, J.) (stating that the law of nations is part of federal common law).[58]

55. *See* note 48, *supra; see also* Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 331 (describing the general effect of a norm's *jus cogens* status).

56. Courts in many nations go further in treating international law as binding against their governments, incorporating customary international law into domestic law and permitting it to trump domestic statutes and common law. *See* J.G. Starke, *Introduction to International Law* 86–87 (10th ed.1989).

57. *See also Ware,* 3 U.S. (3 Dall.) at 256–80 (Iredell, J.) (applying the law of nations); *id.* at 279 (stating the principle that statutes should not be interpreted to violate international legal obligations); *id.* at 263 (clarifying that ordinarily, customary international law is binding on nations); *id.* at 254–55 (Paterson, J.) (applying the law of nations); *id.* at 226–31, 242–45 (Chase, J.) (same).

58. *See also Talbot,* 3 U.S. (3 Dall.) at 169 (Rutledge, C.J.) (applying the law of nations); *id.* at 157 (Paterson, J.) (similar).

The Seventh Circuit has taken a narrow view of the domestic application of customary international law. *See Sampson,* 250 F.3d at 1153 n. 4. The Seventh Circuit's view that "it does not follow [from *Charming Betsy* ] that federal statutes must be read to reflect the norms of international law," *id.* at 1152–53, is exceptionally difficult to square with Supreme Court precedent, however. The Seventh Circuit suggests that the nineteenth century cases "apparently meant that customary international law was included in the general common law recognized in *Swift v. Tyson,* 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842)," and that "[t]he general common law, unlike the federal common law of today, did not fall under the Supremacy Clause of the United States Constitution," so "the exact meaning of these early pronouncements on the domestic role of customary international law became less certain after the Supreme Court's rejection of a general common law in *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)." *Id.* The Seventh Circuit apparently did not consider *First National City Bank,* 462 U.S. 611, 103 S.Ct. 2591, or *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21–22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), both of which were decided decades after *Erie. See also Banco Nacional de*

As discussed above with regard to treaties, venerable precedent makes clear that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Charming Betsy*, 6 U.S. (2 Cranch) at 118; *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963) (applying the canon in interpreting the National Labor Relations Act, 29 U.S.C. §§ 151–169); *Lauritzen v. Larsen*, 345 U.S. 571, 578, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) (noting the canon's applicability in interpreting federal shipping laws); *MacLeod*, 229 U.S. at 434, 33 S.Ct. 955; *Ware*, 3 U.S. (3 Dall.) at 279 (Iredell, J.); Restatement, *supra*, § 114.[59]

The United States has at times demonstrated a certain unwillingness to permit international law to decide domestic disputes. *See* Anne Bayefsky & Joan Fitzpatrick, *International Human Rights Law in United States Courts: A Comparative Perspective*, 14 Mich. J. Int'l L. 1, 1 (1992). In particular, American courts have often been reluctant to apply customary international law, in spite of binding Supreme Court precedent. *See id.* at 27. This is particularly remarkable, given how recently the Supreme Court has reaffirmed the importance of international law in defining the liberties protected by the Bill of Rights. *See Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 2481, 2483, 156 L.Ed.2d 508 (2003) (discussing the relevance of laws and practices of other nations, international treaties, and decisions of the European Court of Human Rights, in determining what limits the Due Process Clause of the Fourteenth Amendment places on states' power to regulate private sexual conduct between consenting adults); *Atkins v. Virginia*, 536 U.S. 304, 316 n. 21, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (treating evidence of the world community's overwhelming disapproval of executing mentally retarded criminals as probative in determining whether the practice violates the prohibition against cruel and unusual punishment); *Thompson v. Oklahoma*, 487 U.S. 815, 830–31 & n. 31, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (giving similar consideration to world opinion in determining whether the Constitution would permit ex-

*Cuba v. Sabbatino*, 376 U.S. 398, 425, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (clarifying that even after *Erie*, "an issue concerned with the basic choice regarding the competence and function of the Judiciary and National Executive in ordering our relationships with other members of the international community must be treated exclusively as a matter of federal law").

In any case, it is difficult to imagine how *Erie* could have modified earlier precedent on how federal courts should interpret federal statutes. The only conceivable effect *Erie* could have had would have been on the application of customary international law to the states, via federal common law, in diversity cases, and even there, the Supreme Court has confirmed that *Erie* did not change the law. *See Banco Nacional*, 376 U.S. at 425–26, 84 S.Ct. 923 (clarifying that even after *Erie*, "rules of international law should not be left to divergent and perhaps parochial state in-

terpretations"). For the majority view in these matters, see Harold Hongju Koh, *Is International Law Really State Law?*, 111 Harv. L.Rev. 1824 (1998), and Louis Henkin, *International Law as Law in the United States*, 82 Mich. L.Rev. 1555 (1985). For a reply to Professor Koh's arguments, see Curtis A. Bradley & Jack L. Goldsmith, *Federal Courts and the Incorporation of International Law*, 111 Harv. L.Rev. 2260 (1998).

**59.** *See also* note 47, *supra*. Even Justices Scalia and Thomas, two of the Supreme Court's most adamant critics of the consideration of international norms in interpreting the Eighth and Fourteenth Amendments, acknowledge the continuing viability of the *Charming Betsy* canon. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 814–21, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting, joined by O'Connor, Kennedy, and Thomas, JJ.).

ecution of criminals under the age of 16).[60] Needless to say, until Congress, the Supreme Court, or a new constitutional amendment commands otherwise, this Court will afford international law the status it has always enjoyed in federal law.

 The Court need not at this juncture resolve difficult questions regarding: which of the relevant treaties are self-executing; whether and to what extent the norms expressed therein or embodied in customary international law are more protective of prisoners' rights than the Eighth Amendment; what effect United States reservations to the relevant treaties, expressing an understanding that they require no more than the Eighth Amendment, might have;[61] and the extent to which a customary norm with *jus cogens* status can become binding even on a state that persistently objects to it.[62] Suffice it to say that international law creates an independent source of obligation to provide to prisoners at least those protections that the Eighth Amendment provides. Regardless of whether and to what extent treaties or customary law can provide an implied cause of action,[63] courts must approach prisoner cases under domestic law with an appreciation for the United States' international obligations.

### c. Interpretive Presumptions

 International law and the federal Constitution guide adjudication of prisoner cases in two ways. First, each requires that inmate complaints be given serious consideration. As a member of the international community and as a nation, the

---

60. Admittedly, the consensus in favor of enforcing the original understanding of the Constitution and the long line of precedent supporting it is weaker than it once was. Occasionally a Supreme Court majority opinion will attempt to chisel away at that understanding in dicta, perhaps in a footnote. *See Stanford v. Kentucky*, 492 U.S. 361, 369 n. 1, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (Scalia, J., opinion of the court) ("We emphasize that it is *American* conceptions of decency that are dispositive, rejecting the contention ... that the sentencing practices of other countries are relevant."). According to Justice Scalia's view, other nations' practices are only relevant as evidence that a uniform practice within this country is more than "a historical accident," such that it potentially has a place in the Constitution. *Id.* As the Court has already mentioned, however, even Justices Scalia and Thomas acknowledge the continuing viability of the *Charming Betsy* canon. *See Hartford Fire Ins. Co.*, 509 U.S. at 814–21, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting).

There has also been some congressional hostility to the role international law plays in domestic judicial decisions. For example, Representatives Thomas Feeney (R–Fla.) and Robert Goodlatte (R–Va.) have introduced a resolution that would prohibit federal judges from relying on foreign court decisions when interpreting American law, and the resolution has at least 60 co-sponsors in the House of Representatives. *See* Luiza Savage, *Legislators Eye Foreign–Law Threat*, New York Sun, Mar. 26, 2004, *available in* 2004 WL 65908596.

61. When the United States ratifies human rights agreements, it often does so subject to extensive reservations, understandings, and declarations to the effect, *inter alia*, that the treaty is not understood to require a change in United States law or practice, that the United States does not submit to the jurisdiction of the International Court of Justice, that implementation of the treaty can be left largely to the states, and that the treaty is non-self-executing. Louis Henkin, *U.S. Ratification of Human Rights Conventions: The Ghost of Senator Bricker*, 89 Am. J. Int'l L. 341, 341 (1995); *see generally id.* (criticizing this practice).

62. For a general discussion of this question, see Ted L. Stein, *The Approach of a Different Drummer: The Principle of the Persistent Objector in International Law*, 26 Harv. Int'l L.J. 457 (1985).

63. Some courts have held as much. *See, e.g., Rodriguez Fernandez*, 505 F.Supp. at 798. *But see White*, 997 F.Supp. at 1385.

United States is committed to eradicating torture and cruel, inhumane, and degrading punishment. Second, Courts must strive to interpret statutes and regulations and to apply federal common law in a way that vindicates our human rights commitments.

■ Just as the *Charming Betsy* canon helps domestic law realize international obligations, so the constitutional avoidance canon, which requires courts to strive to interpret statutes to avoid serious constitutional questions, helps keep government within lawful bounds without necessitating frequent battles between the judiciary and the political branches. *See, e.g., Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).[64] Similarly, "when a particular interpretation of a statute invokes the outer limits of Congress' power, [courts] expect a clear indication that Congress intended that result." *INS v. St. Cyr*, 533 U.S. 289, 299, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)). As a general matter, "[i]n traditionally sensitive areas, ... the requirement of clear statement assures

that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Gregory v. Ashcroft*, 501 U.S. 452, 461, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (quoting *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)).

Courts have also consistently interpreted statutes to protect "discrete and insular minorities,"[65] and there can be little doubt that prisoners are as vulnerable to oppression by the political majority as any group in society. *See* Krent, *supra*, at 1068–69. Interpretive canons protect immigrants, *see, e.g., INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (citing authority for "the long-standing principle of construing lingering ambiguities in deportation statutes in favor of the alien"), and Indian tribes, *see, e.g., Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians ....."); *Winters v. United States*, 207 U.S. 564, 576, 28 S.Ct. 207, 52 L.Ed. 340(1908) ("[A]mbiguities occurring [in treaties and agreements with Indian tribes] will be resolved from the standpoint of the Indians."). A number of cases have effected

---

**64.** *See also INS v. St. Cyr*, 533 U.S. 289, 300 & n. 12, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (collecting cases invoking the constitutional avoidance canon).

**65.** *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (noting that "a more searching judicial inquiry" under the Equal Protection Clause might be needed where prejudice against such minorities "curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities"); *see generally* John Hart Ely, *Democracy and Distrust* (1980) (arguing that judicial intervention under constitutional provisions like the Equal Protection Clause and the Due Process Clause is most appropriate when governmental action distorts the political process, as in cases

involving racial prejudice or malapportionment or gerrymandering of electoral districts); Bruce A. Ackerman, *Beyond Carolene Products*, 98 Harv. L.Rev. 713, 718 (1985) (arguing that *Carolene*'s "four operative terms"—"prejudice," "discrete," "insular," and "minorities"—seek "to identify groups that have been unconstitutionally deprived of their fair share of democratic influence"). For other useful discussions of the *Carolene Products* decision as a proper statement of the judiciary's role in a democracy, see Robert M. Cover, *The Origins of Judicial Activism in the Protection of Minorities*, 91 Yale L.J. 1287 (1982), and Owen M. Fiss, *The Supreme Court, 1978 Term—Foreword: The Forms of Justice*, 93 Harv. L.Rev. 1, 5–17 (1979).

the courts' traditional role as protectors of minority rights by interpreting statutes in light of the social reality surrounding marginalized groups. *See Steelworkers v. Weber*, 443 U.S. 193, 201–02, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, to permit private race-conscious affirmative action programs favoring racial minorities, even though a "literal construction" would prohibit such programs); *see also Johnson v. Transportation Agency*, 480 U.S. 616, 641–42, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (applying the *Weber* analysis to a state agency's affirmative action policies favoring women); *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 290–92, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (holding that Title VII did not prohibit or preempt a state statute that required reinstatement of workers returning from pregnancy disability leave, even though males returning from disability leave had no similar right); *cf. Grutter v. Bollinger*, 539 U.S. 306, 325, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (holding that a public law school's consideration of race in its admissions program did not violate the Equal Protection Clause of the Fourteenth Amendment); *Bob Jones Univ. v. United States*, 461 U.S. 574, 592–96, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (holding that a general tax exemption for charitable institutions should not be interpreted to apply to a private university with racially discriminatory policies and admissions standards, because such an interpretation would be inconsistent with the nation's constitutional and political commitment to ending racial discrimination). Similarly, the presumption in favor of judicial review of governmental action, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), *superceded on other grounds*, 42 U.S.C. § 1395ff(b), and the requirement that courts read generously the complaints of pro se litigants (who in the federal system are most frequently poor people, prisoners challenging their sentences or conditions of confinement, or both), *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *United States v. Morgan*, 346 U.S. 502, 505 & n. 3, 74 S.Ct. 247, 98 L.Ed. 248 (1954),[66] ensure that the rights of prisoners and other marginalized citizens are vindicated.

 Thus, although courts must accord due deference to prison officials and policies, both in deciding whether to intervene in prison management and in determining the appropriate scope and character of any relief, *see, e.g., Turner v. Safley*, 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), they have also have a duty to apply to prisoners' claims interpretive presumptions that protect basic human rights.

### 4. Judicial Vindication of Prisoners' Rights During the Past Half Century

The federal government, intergovernmental institutions, and various nongovernmental organizations have determined that many prisoners in this country live under cruel, inhumane, or degrading conditions, and that in many cases these conditions violate fundamental human rights commitments in our Constitution and in international law. Case law confirms that these reports accurately describe reality, without exaggeration, although there is evidence that things are improving. In 1984, 24.3 percent of state prison facilities and 15.1 percent of jails were subject to court orders, and in 2000 the figures were 22.7 percent and 13.4 percent, respectively.

---

**66.** *See also Hughes v. Rowe*, 449 U.S. 5, 9–10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam); *Gamble*, 429 U.S. at 106, 97 S.Ct. 285.

Charles F. Sabel & William H. Simon, *Destabilization Rights: How Public Law Litigation Succeeds*, 117 Harv. L.Rev. 1015, 1038 n. 67 (2004) (citing Margo Schlanger, *Inmate Litigation After the Deluge: Part II*, Court Order Cases 9, 19 (July 26, 2002) (unpublished manuscript)).[67] As of 1995, 48 of the country's 53 jurisdictions[68] had had at least one facility declared unconstitutional by the federal courts,[69] and in virtually every case the courts had made significant improvements. Malcolm M. Feeley & Edward L. Rubin, *Judicial Policy Making and the Modern State: How the Courts Reformed America's Prisons* 40 & nn. 83–84 (1999). Federal decisions have addressed virtually every aspect of the prison systems in Alabama, Alaska, Arkansas, Delaware, Mississippi, New Mexico, Rhode Island, South Carolina, Tennessee, and Texas. *Id.* at 39–40 & nn. 77, 88.[70] Comprehensive orders have issued regarding numerous facilities in Georgia[71] and Louisiana,[72] and

**67.** The federal government's prison figures are slightly different from Professor Schlanger's. According to the federal government, as of June 30, 2000, 357 facilities, or 21% of existing facilities, were under state or federal court order for the totality of conditions, to limit population, or for specific conditions of confinement. *Census of State and Federal Corrections Facilities*, *supra*, at 9. In 1995, 456 facilities, or 31%, had similar directives. *Id.* Of the facilities under such orders in 2000, 324 were state-operated and 33 were privately operated. *Id.* Federal prisons were under no such orders, although 77 of them were under court orders regarding inmate phone service, and one was required to limit population in 1995. *Id.*

**68.** These include the fifty states, the District of Columbia, the Commonwealth of Puerto Rico, and the Virgin Islands.

**69.** In 1981, Justice Brennan provided a representative list of cases. *See Rhodes*, 452 U.S. at 353 & n. 1, 101 S.Ct. 2392 (Brennan, J., concurring) (citing, *inter alia*, *Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980) (Colorado), *Burks v. Teasdale*, 603 F.2d 59 (8th Cir. 1979) (Missouri), *Todaro v. Ward*, 565 F.2d 48 (2d Cir.1977) (New York), *Williams v. Edwards*, 547 F.2d 1206 (5th Cir.1977) (Louisiana), *Watson v. Ray*, 90 F.R.D. 143 (S.D.Iowa 1981), *Capps v. Atiyeh*, 495 F.Supp. 802 (D.Or.1980), *Lightfoot v. Walker*, 486 F.Supp. 504 (S.D.Ill.1980), *Kendrick v. Bland*, No. 76–0079–P (W.D.Ky. Oct. 24, 1980), *Harris v. Cardwell*, No. CIV–75–185–PHX–CAM (D.C.Ariz. Oct. 14, 1980), *Feliciano v. Barcelo*, 497 F.Supp. 14 (D.P.R.1979), *Stewart v. Rhodes*, 473 F.Supp. 1185 (S.D.Ohio 1979), *Guthrie v. Cardwell*, No. 3068 (S.D.Ga. Dec.1, 1978), *Johnson v. Levine*, 450 F.Supp. 648 (D.Md.1978), *aff'd in part*, 588 F.2d 1378 (4th Cir.1978), *Laaman v. Helgemoe*, 437 F.Supp. 269 (D.N.H.1977), *Barnes v. Government of Virgin Islands*, 415 F.Supp. 1218 (D.Vi.1976), *Costello v. Wainwright*, 397 F.Supp. 20 (M.D.Fla.1975), *aff'd*, 525 F.2d 1239 (5th Cir. 1976), *vacated on reh'g on other grounds*, 539 F.2d 547 (5th Cir.1976) (en banc), *rev'd*, 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977), *aff'd on remand*, 553 F.2d 506 (5th Cir.1977) (en banc) (per curiam), *Battle v. Anderson*, 376 F.Supp. 402 (E.D.Okla.1974), *aff'd*, 564 F.2d 388 (10th Cir.1977), and *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1973) (Garrity, Jr., J.)).

**70.** *See Plyler v. Moore*, 100 F.3d 365 (4th Cir.1996) (describing the long history of the consent order governing South Carolina prisons, including its subsequent modifications and ultimate termination); *Grubbs v. Bradley*, 552 F.Supp. 1052 (M.D.Tenn.1982); *Rhodes*, 452 U.S. at 353, 358 & n. 1, 101 S.Ct. 2392 (Brennan, J., concurring) (citing *Duran v. Apodaca*, No. Civil 77–121–C (D.N.M. July 17, 1980); *Ruiz*, 503 F.Supp. 1265 (Texas); *Finney v. Mabry*, 458 F.Supp. 720 (E.D.Ark. 1978); *Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I.1977), *remanded*, 599 F.2d 17 (1st Cir.1979); *Anderson v. Redman*, 429 F.Supp. 1105 (D.Del.1977); *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976), *aff'd as modified*, 559 F.2d 283 (5th Cir.1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam); *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss.1972), *aff'd*, 501 F.2d 1291 (5th Cir.1974); *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), *aff'd*, 442 F.2d 304 (8th Cir.1971)).

**71.** *Cason v. Seckinger*, 231 F.3d 777 (11th Cir.2000) (discussing fourteen consent orders

have issued regarding overcrowding and other conditions in the entire Florida system[73] and almost all of the North Carolina system.[74]

Going back at least as far as the late 1960s, courts have been active in ensuring that prisons meet Eighth Amendment standards. Feeley & Rubin, *supra*, at 39; Sabel & Simon, *supra*, at 1034–35. The role courts have played in this arena resembles that played in other "public law" cases involving schools, mental health facilities, housing, and law enforcement, famously described by Professor Abram Chayes. *See generally* Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv. L.Rev. 1281 (1976); *see also In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1010–12 (1st Cir.1988) (citing Professor Chayes's article extensively in describing the transformation of federal judges' role under the Federal Rules of Civil Procedure from a focus on settling disputes toward increased "judicial initiative and governance" in ever "larger and more intricate" litigation).

Although courts have sometimes had to maintain long-term oversight of prison systems that continue to violate the Constitution, *see, e.g., Ruiz v. Johnson*, 154 F.Supp.2d at 1001,[75] much conditions of

confinement litigation has in fact led to substantial improvements. As Professors Sabel and Simon describe:

> Especially in the harshest systems in the South, intervention has led to the elimination of the routine or authorized use of torture; to the abandonment of convict-leasing, inmate "trusties," and other managerial structures with high potential for abuse; to personnel, training, and supervisory changes that professionalized management; and to modest improvement, at least, in the physical amenity of confinement. Although many of the institutions are still foul and dangerous places, they are better than they used to be in many ways.

Sabel & Simon, *supra*, at 1035 (citing Feeley & Rubin, *supra*, at 73, 93–95).

## B. The Nature of Kane's Action

Having described the legal standards and demonstrated that solicitude for prisoners suits is both legally required and socially beneficial, the Court must now determine which of Kane's claims it may properly consider, and under what legal theories. The Court begins with the claim that the Warden has violated BOP regula-

---

addressing prison conditions in prison conditions that existed in the Middle Georgia Correctional Complex); *Guthrie v. Evans*, 815 F.2d 626 (11th Cir.1987) (dismissing an appeal of final judgment governing the Georgia State Prison).

**72.** *See Hamilton v. Morial*, 644 F.2d 351 (5th Cir.1981) (discussing numerous cases alleging unconstitutional overcrowding in the Louisiana state penitentiary, parish prisons, and parish and city jails); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir.1977) (Louisiana State Penitentiary at Angola).

**73.** *Costello v. Wainwright*, 397 F.Supp. 20 (M.D.Fla.1975) (issuing a preliminary injunction), *vacated on other grounds*, 539 F.2d 547

(5th Cir.1976) (en banc), *rev'd* 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977).

**74.** Feeley & Rubin, *supra*, 41 n. 106 (citing *Small v. Martin*, No. 85–987–CRT (E.D.N.C. 1988) and *Hubert v. Ward*, No. C–E–80–414–M (W.D.N.C.1985)).

**75.** *See also, e.g., Glover v. Johnson*, 934 F.2d 703, 715 (6th Cir.1991) (affirming the district court's order to appoint an administrator, and noting the prisoner class's eleven-year struggle against the "consistent and persistent pattern of obfuscation, hyper-technical objections, delay, and litigation by exhaustion on the part of the defendants to avoid compliance with the letter and the spirit of the district court's orders").

tions, with the BOP's acquiescence. There is surprisingly little case law on whether and to what extent federal prisoners can obtain relief in a judicial forum for violations of BOP regulations. As the Court explains, the case law governing 42 U.S.C. § 1983 relief for violations of state prison regulations is not particularly on point.

### 1. Nonapplicability of *Sandin v. Conner* to Federal Prisoners

In *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that a state prisoner could not succeed in a Section 1983 suit alleging violation of state prison regulations, unless the violation led to restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484, 115 S.Ct. 2293. Thus, although state prison regulations might create a liberty interest under the Due Process Clause of the Fourteenth Amendment, that interest only consisted in freedom from such restraint. Under this "atypical and significant hardship" standard, the Supreme Court concluded that on the record presented, solitary confinement imposed in violation of state prison regulations did not violate the prisoner's rights to due process. *Id.* at 486, 115 S.Ct. 2293.

Dr. Stuart Grassian of the Harvard Medical School has documented how solitary confinement commonly leads to symptoms such as "perceptual distortions, hallucinations, hyperreponsivity to external stimuli, aggressive fantasies, overt paranoia, inability to concentrate, and prob-

lems with impulse control," a series of symptoms that has been classified as "Reduced Environmental Stimulation," or "RES." *Madrid,* 889 F.Supp. at 1230 (citing the consistent reports found in the literature authored by Dr. Grassian and other experts); *also Davenport v. DeRobertis,* 844 F.2d 1310, 1313, 1316 (7th Cir. 1988) (citing an article authored by Dr. Grassian as an example of the substantial literature concerning the ill effects of solitary confinement). If the Due Process Clause gives a federal court only limited power to interfere with a state's unlawful engagement in this sort of psychological torture, then it might appear that at best, Kane's claims regarding violations of BOP regulations are subsumed in his constitutional claims.[76]

Yet *Sandin* was a case about what rights state prisoners have under the Due Process Clause of the Fourteenth Amendment; it did not address what rights federal prisoners have. Federal courts lack power to issue injunctions forcing a state or its agents to comply with state law, except to the extent that those actions also violate the United States Constitution or other federal law. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).[77] Thus, a case involving a state prison system's violation of its own regulations simply would not present a federal question if the violations fell short of the *Sandin* standard. One hopes that the prisoner could seek an injunction in some manner in state courts, but the United States Constitution has little to say on the matter.[78]

---

76. Courts have placed some constitutional limits on the use of solitary confinement and other forms of psychological torture. *See, e.g., Hutto,* 437 U.S. at 685–88, 98 S.Ct. 2565; *Jones 'El,* 164 F.Supp.2d at 1117; *Madrid,* 889 F.Supp. at 1264; *Ruiz,* 37 F.Supp.2d at 914.

77. For criticism of this decision, see, for example, David L. Shapiro, *Wrong Turns: The Eleventh Amendment and the* Pennhurst *Case,* 98 Harv. L.Rev. 61 (1984).

78. It should be noted that *Pennhurst* only dealt with injunctive relief. *See* Shapiro, *supra,* at 82 (citing *Pennhurst,* 465 U.S. at 111 n. 21, 104 S.Ct. 900). *Pennhurst* need not be

It is conceivable that the United States government could create a system in which federal prisoners could only challenge those violations of prison regulations that rise to the level of constitutional violations. The Court need not express any opinion on whether and how the United States could create such a system, however, because to its credit, it has not in fact done so. Any number of federal statutes and regulations apply to treatment of prisoners, including BOP regulations, so any court applying *Sandin* to federal prisoners would have to hold that there is no way for prisoners to bring federal court challenges against violations of federal law by federal prison officials. That simply is not the law.

In two habeas corpus cases, the Supreme Court has passed on prisoners' challenges to BOP regulations and policies without anywhere suggesting that *Sandin* might apply to such claims. *See Lopez v. Davis*, 531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001); *Reno v. Koray*, 515 U.S. 50, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995). Of course, both cases involved claims by prisoners that the BOP was required to release them earlier than planned, so they were properly cognizable in habeas, and it is well settled that habeas will lie to challenge detention in violation of a federal statute, regardless of whether any constitutional violation is involved. *See, e.g., Davis v. United States*, 417 U.S. 333, 344–45, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974) (holding as much for federal habeas corpus relief under 28 U.S.C. § 2255).

More to the point, however, it is clear that federal statutes can apply to both federal and state prisoners, and that even state prisoners can raise conditions of confinement claims based on such statutes. In *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), the Supreme Court unanimously held that Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131–12134, which prohibits a "public entity" from discriminating against a "qualified individual with a disability" on account of that disability, 42 U.S.C. § 12132, covers inmates in state prisons. *Yeskey*, 524 U.S. at 213, 118 S.Ct. 1952.[79] The Supreme Court held that even if the rule requiring a clear statement of congressional intent before interpreting an ambiguous statute "to alter the usual constitutional balance between the States and the Federal Government" were applicable, *see Gregory*, 501 U.S. at 460–61, 111 S.Ct. 2395, the ADA was not in fact ambiguous. *Yeskey*, 524 U.S. at 208–09, 118 S.Ct. 1952.

The Supreme Court thus permitted a state inmate to challenge state prison conditions that violated federal law, but did not violate the federal Constitution. Nowhere does the Supreme Court suggest that only ADA violations that meet *Sandin*'s "atypical and significant hardship" standard are applicable. Given that state prison officials receive greater solicitude in federal law than do federal prison officials, *see Turner*, 482 U.S. at 84–85, 107 S.Ct. 2254, *Yeskey* necessarily applies to federal prisoners as well. *Accord, e.g., Peddle v. Sawyer*, 64 F.Supp.2d 12, 18–19 (D.Conn. 1999) (permitting a federal inmate to sue prison officials under the Violence Against

read to preclude a federal court's exercise of supplemental jurisdiction over damages claims based on state law, even if a state prisoner cannot win on the federal claims alleged. At most, Pennhurst would merely be instructive on the question of how to weigh judicial economy against concerns for state prerogatives.

**79.** The Supreme Court did not reach the question whether application of the ADA to state prisons exceeded Congress' power under the Commerce Clause or under Section 5 of the Fourteenth Amendment. *Yeskey*, 524 U.S. at 212–13, 118 S.Ct. 1952.

Women Act, 42 U.S.C. § 13981); *cf.*
*Davis,* 417 U.S. at 344–45, 94 S.Ct. 2298.
Thus, there is no reason to believe that
*Sandin* had any impact on the viability of
*United States v. Muniz,* 374 U.S. 150, 83
S.Ct. 1850, 10 L.Ed.2d 805 (1963), which
allowed a lawsuit by federal prisoners un-
der the Federal Tort Claims Act, 28 U.S.C.
§§ 1346(b), 2401(b), 2671–2680, against
negligent federal employees for injuries
they caused.[80]

Although it may be uncontroversial that
federal statutes can provide inmates with a
cause of action, there is some dispute as to
whether and under what circumstances a
prisoner can sue to challenge violations of
BOP regulations. A few principles are

worth noting at the outset. First, as de-
scribed above, there are the presumptions
in favor of vindicating the rights of prison-
ers, as defined under the Constitution and
under international law, and in favor of
providing remedies for violations of such
rights. Courts also must err on the side of
protecting prisoners and other members of
marginal groups when interpreting stat-
utes. Moreover, federal law has a strong
presumption that agencies must conform
their conduct . to their own regulations.
*See Morton v. Ruiz,* 415 U.S. 199, 235, 94
S.Ct. 1055, 39 L.Ed.2d 270 (1974) ("Where
the rights of individuals are affected, it is
incumbent upon agencies to follow their
own procedures. This is so even where
the internal procedures are more rigorous

**80.** Some courts apparently apply *Sandin* to
federal prisoners, without considering the
possibility that a prisoner can seek relief from
violations of BOP regulations, even when
such violations do not run afoul of the Consti-
tution. *See, e.g., Tellier v. Fields,* 280 F.3d 69,
79–83 (2d Cir.2000); *Crowder v. True,* 74 F.3d
812, 814–15 (7th Cir.1996). In a pre-*Sandin*
case, the Eighth Circuit failed to consider the
possibility that a federal prisoner could make
"sub-constitutional" habeas claims based on
federal statutes or regulations, even though
the dissent explicitly urged the court to do so.
*Albers v. Ralston,* 665 F.2d 812, 815–16 (8th
Cir.1981); *id.* at 818–19 (Arnold, J., dissent-
ing). It is unclear whether these courts failed
to consider relief because they believed such
relief was unavailable, or because the prison-
ers did not raise the claim, and the courts
failed to read their complaints as raising ordi-
nary claims for relief from agency action. In
the case of the Seventh Circuit, it may have
been the latter, because in another case it
contemplated the possibility of an APA-based
suit against the BOP and its agents. *See
Bunn v. Conley,* 309 F.3d 1002, 1009–10 (7th
Cir.2002). Regardless of these courts' rea-
sons for failing to consider ordinary federal
law claims, this Court respectfully disagrees
with their approach, and it appears that the
Supreme Court does as well.

There are also cases where courts apply
*Sandin* to prisoners seeking money damages
for violations of BOP regulations, apparently
without considering the possibility of a claim

under provisions of the Tucker Act, 28 U.S.C.
§ 1346(a)(2), or the Federal Tort Claims Act,
28 U.S.C. §§ 1346(b), 2401(b), 2671–2680.
Even if procedural barriers—like failure to
name the United States as a defendant in a
Federal Tort Claims Act action—arise, courts
should still consider the possible claims. At
the same time, there are several reasons why
this is a less objectionable oversight than in
cases seeking injunctive relief. A Tucker Act
claim is likely unavailable, because it is
doubtful that any "source of substantive law"
on which prisoners might rely could "fairly
be interpreted as mandating compensation by
the Federal Government for the damage sus-
tained." *United States v. Mitchell,* 463 U.S.
206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580
(1983) (quoting *United States v. Testan,* 424
U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114
(1976)) (internal quotation marks omitted).
Similarly, claims under the Federal Tort
Claims Act will often be barred by one of
many exceptions to liability, particularly the
"due care" and "discretionary function" ex-
ceptions, 28 U.S.C. § 2680(a), the exception
for numerous specific torts found in 28 U.S.C.
§ 2680(h), and the unavailability of suit based
on any strict liability theory, *Laird v. Nelms,*
406 U.S. 797, 803, 92 S.Ct. 1899, 32 L.Ed.2d
499 (1972). Moreover, 28 U.S.C.
§ 1346(b)(2) makes money damages unavail-
able in prisoner suits without a showing of
"physical injury." Still, it is incumbent upon
courts to address these questions when a pris-
oner's suit fairly raises them.

than would be required."); *Maine v. Thomas,* 874 F.2d 883, 890–91 (1st Cir. 1989) (quoting this passage from *Morton,* 415 U.S. at 235, 94 S.Ct. 1055, and collecting consistent cases); *Caldwell v. Miller,* 790 F.2d 589, 610 (7th Cir.1986) ("An inmate, too, has the right to expect prison officials to follow [BOP] policies and regulations"); *Anderson v. Smith,* 697 F.2d 239, 240 (8th Cir.1983) (per curiam) (similar). There is also a strong presumption in favor of judicial review of agency action. *See Bowen,* 476 U.S. at 670, 106 S.Ct. 2133.

The Court must therefore determine whether federal law rebuts the presumptions favoring the recognition of a cause of action to challenge violations of BOP regulations. If there is no bar to review, the Court must then determine the nature of the available causes of action.

### 2. Applicability of the Administrative Procedure Act

■ Kane correctly points to provisions of the Administrative Procedure Act that govern judicial review of agency action. *See* 5 U.S.C. §§ 701–706. Although the APA is not an independent grant of subject matter jurisdiction, *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), 28 U.S.C. § 1331 provides subject matter jurisdiction for a review proceeding under the APA. *See id.; Conservation Law Foundation, Inc. v. Busey,* 79 F.3d 1250, 1261 (1st Cir.1996).[81] Unless a federal statute specifies otherwise, or the action is "committed to agency discretion by law," a "final action" of any federal agency is subject to judicial review. 5 U.S.C. §§ 701–702, 704; *see Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). Thus, if the

BOP is an "agency," and the other relevant requirements are met, Kane can seek review of the BOP's actions under the APA.

■ The APA defines "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 701(b)(1). It then provides a list of exceptions, none of which applies to the BOP. *Id.* The fact that Congress specifically excepted "military authority exercised in the field in time of war or in occupied territory" suggests that had Congress wished to except prison officials, who like soldiers have responsibilities that include using violence to promote security, it would have done so explicitly. *Id.* Similarly, some weight should be given to the fact that Congress has precluded review of BOP decisions under the APA in some areas, but not others, suggesting a default rule of APA applicability. *See, e.g.,* 18 U.S.C. § 3625 (precluding judicial review of the BOP's substantive decisions regarding granting or denial of early release). Admittedly, the views of later Congresses are far from determinative of what the original statute means, but they are entitled to some respect, particularly as regards "quasi-constitutional" statutes like the APA. *Cf. Califano,* 430 U.S. at 105–06, 97 S.Ct. 980 (interpreting the APA in light of a later-passed statute).

There is thus nothing in the APA to suggest that the BOP is not an "agency" subject to the Act, and the Supreme Court apparently considers the BOP to be governed by the APA. *See Lopez,* 531 U.S. at 240, 121 S.Ct. 714; *Koray,* 515 U.S. at 61, 115 S.Ct. 2021. Even before these decisions came down, virtually every circuit

---

**81.** The Court need not consider to what extent 28 U.S.C. § 1337 provides an alternative source of federal question jurisdiction.

that had resolved the question had held that the APA applied to the BOP. *Compare Clardy v. Levi*, 545 F.2d 1241, 1244–46 (9th Cir.1976) (holding that the APA does not apply to the BOP),[82] *with White v. Henman*, 977 F.2d 292, 293 (7th Cir.1992) (holding that it does), *and Ramer v. Saxbe*, 522 F.2d 695, 697 (D.C.Cir.1975) (same), *with Venegas v. Henman*, 126 F.3d 760, 763 (5th Cir.1997) (assuming that it does), *and with Allen v. Aytch*, 535 F.2d 817, 822 n. 23 (3d Cir.1976) (acknowledging but not answering the question whether it applies),[83] *and Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir.1978) (same), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447; *see also Bell*, 441 U.S. at 529 n. 11, 99 S.Ct. 1861 (specifically noting that the Second Circuit's holdings under the APA were not before the Supreme Court).

Moreover, the *Yeskey* Court's interpretation of the ADA is instructive. It held that the term "public entity," defined to include "any department, agency, special purpose district, or other instrumentality of a State or States or local government," 42 U.S.C. § 12131(1)(B), unambiguously included prisons. *Yeskey*, 524 U.S. at 210, 118 S.Ct. 1952. If the ADA's language does not have sufficient "play in the joints" to avoid applying it to state prisons, this Court cannot see how the APA is any different. In any case, to the extent the APA is "ambiguous" on the point, all of the interpretive presumptions favoring prisoners militate in favor of applying the statute to the BOP.

None of the statutes governing the BOP appears to exempt its decisions regarding medical care from judicial review. 18 U.S.C. § 3625 forbids application of the APA to "the making of any determination, decision, or order" under 18 U.S.C. §§ 3621–3626, but none of those statutes applies here. Given that a decision to deny an inmate a course of treatment is necessarily a "final action," at least once administrative remedies have been exhausted, the only remaining bar to review is the possibility that decisions regarding medical care are "committed to agency discretion by law," and are thus not subject to judicial review under the APA. *See* 5 U.S.C. § 701(a)(2); *Wolfish*, 573 F.2d at 125 (suggesting that BOP implementation of governing statutes may fall under this provision). This is a "very narrow exception," however, applicable in those "rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 79–752, at 26 (1945)), *overruled on other grounds by Califano*, 430 U.S. at 105, 97 S.Ct. 980. For example, unless Congress has set "substantive priorities" or "otherwise circumscrib[ed] an agency's power to discriminate among issues or cases," its "decision not to take enforcement action should be presumed to be immune from judicial review under § 701(a)(2)." *Heckler v. Chaney*, 470 U.S. 821, 832–33, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Suffice it to say that this exception to the presumption in favor of judicial review does not apply to a decision about distribution of benefits among individuals under an agency's charge. In such cases, the agency is act-

---

**82.** To be clear, *Clardy* held the APA inapplicable to prison disciplinary hearings only. The Ninth Circuit has since applied the APA to the BOP in other contexts. *See Gunderson v. Hood*, 268 F.3d 1149, 1154 (9th Cir.2001).

**83.** The Third Circuit held in a later case that the BOP had complied with the APA, without considering whether compliance was required. *See James v. Quinlan*, 866 F.2d 627, 631 (3d Cir.1989).

ing as an administrator, not as a prosecutor.

Having determined that the APA applies, the Court assumes for purposes of decision that the *BOP Practice Guidelines* create substantive rights. Some courts have held that because BOP program statements are internal agency guidelines, not "adopted in one of the ways the APA prescribes," they do not create substantive rights. *See, e.g., Miller v. Henman,* 804 F.2d 421, 426 (7th Cir.1986) (internal quotation marks omitted). The proper characterization and status of the *BOP Practice Guidelines* has not been made clear to the Court, however, and because "the line between a legislative or substantive rule and an interpretive one is ... far from clear," *Warder v. Shalala,* 149 F.3d 73, 79 (1st Cir.1998), ultimate resolution of the legal status of the *BOP Practice Guidelines* is inappropriate in the absence of briefing on either side, particularly when such resolution is not necessary to the Court's decision. For an excellent discussion of the problematic distinction between legislative and interpretive rules, see *Monahan v. Winn,* 276 F.Supp.2d 196, 212–15 (D.Mass.2003) (Gertner, J.).

The Court also assumes for purposes of decision that, in this case at least, the Warden is an appropriate named defendant under the APA. This too is an important question that should not be resolved without the benefit of briefing on both sides, and it would be a waste of the parties' time at this point to request such briefing.

### 3. Inappropriateness of Mandamus Relief

■ Because the APA applies, 28 U.S.C. § 1361, which gives the district courts original jurisdiction over mandamus actions to compel federal officers and employees to perform duties owed to a plaintiff, does not apply. Mandamus most commonly lies to compel performance of "a clear nondiscretionary duty," and is an extraordinary remedy that typically should not be invoked if other avenues of relief exist, as they do here. *See, e.g., Heckler v. Ringer,* 466 U.S. 602, 616, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (exemplifying this view); 4 Kenneth C. Davis, *Administrative Law Treatise,* §§ 23.7, at 155, § 23.12, at 169 (1983) (discussing the "orthodox" view of mandamus and the broader view that some Supreme Court cases have taken). *But see, e.g., Work v. United States ex rel. Rives,* 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561 (1925) (taking a broader view of mandamus in holding that it will lie to compel federal officers to stay within the boundaries of their discretion). *See generally* Ann Woolhandler, *Patterns of Official Immunity and Accountability,* 37 Case W. Res. L.Rev. 396, 432–58 (1987) (arguing that Supreme Court decisions regarding remedies against governmental officials historically adopted one of two approaches, with the "legality" model, which focuses on whether an unlawful act has harmed a citizen, dominating in cases involving injunctive relief, and the "discretion" model, which focuses on the extent to which potential liability will hamper officials' decisionmaking process, dominating in cases involving damages relief). Two opinions regarding mandamus relief in a Puerto Rico death penalty case make it clear that the First Circuit ascribes to the "orthodox" view of mandamus, even when money damages are not involved. *See In re Sterling–Suarez,* 323 F.3d 1, 1–2 (2003); *In re Sterling–Suarez,* 306 F.3d 1170, 1172 (1st Cir.2002).

### C. Treatment of Kane's Constitutional Claim and Habeas Petition

■ Under *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics,*

403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), an individual aggrieved by a federal official's violation of his constitutional rights can bring an action for monetary relief. *Id.* at 397, 91 S.Ct. 1999. One can also seek injunctive relief via a *Bivens* action. *See Farmer*, 511 U.S. at 851, 114 S.Ct. 1970 (remanding a prisoner's *Bivens* action in which the prisoner sought both damages and injunctive relief). A prisoner's claim that prison officials have withheld appropriate medical care, in violation of the Constitution, is certainly cognizable as a *Bivens* action, even if other remedies exist under federal law. *See Carlson v. Green*, 446 U.S. 14, 16 & n. 1, 20, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (upholding a *Bivens* claim for inadequate medical care brought by a prisoner's estate, even though the claim could also have been brought under the Federal Tort Claims Act).

 Kane has not filed his suit as a civil rights action under *Bivens* or as an ordinary civil suit under federal law, however. Rather, he has filed it as a petition for habeas corpus under 28 U.S.C. § 2241.[84] Although a habeas corpus petition is the appropriate means to challenge the "fact or duration" of incarceration, actions challenging the conditions of confinement reside more in the heartland of civil actions under 42 U.S.C. § 1983 (for state prisoners), *Bivens*, 403 U.S. 388, 91 S.Ct. 1999 (for federal prisoners), or some other non-habeas doctrine or statute. *See Heck v. Humphrey*, 512 U.S. 477, 481–83, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 488–90,

93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)). Various courts in this Circuit and elsewhere have dismissed habeas petitions (or individual claims contained therein) that challenged conditions of confinement rather than the fact or duration of confinement. *See, e.g., Melham v. Farquharson*, Civ. A. No. 03–10721–DPW, 2003 WL 21397987, at *1 n. 1 (D.Mass. June 17, 2003) (Woodlock, J.) (declining to address a habeas petitioner's claims insofar as they related to conditions of confinement); *Do Vale v. I.N.S.*, Nos. 01–216–ML, 01–507–ML, 2002 WL 1455347, at *9 (D.R.I. June 25, 2002) (dismissing such claims); *Barnes v. I.N.S.*, Civ. No. 01–48–PC, 2001 WL 1006077, at *7 (D.Me. Aug.30, 2001) (recommending a similar disposition); *Kamara v. Farquharson*, 2 F.Supp.2d 81, 89 (D.Mass.1998) (Saris, J.) (dismissing such claims). The Court must now determine whether habeas will lie for Kane's claims, and if not, whether it is appropriate to dismiss his constitutional claim solely on grounds of inartful pleading.

Before analyzing the intersection between habeas corpus and civil rights actions, the Court notes that many of the relevant cases involve state prisoners, not federal ones. In this context, it is perfectly reasonable to apply Section 1983 cases to federal prisoners with *Bivens* claims, because, if anything, the rights of prisoners give way to governmental prerogatives more in cases involving state prison systems than in those involving the federal system, not less. *Cf. Turner*, 482 U.S. at 84–85, 107 S.Ct. 2254 (noting that courts should exercise restraint in second-guess-

---

84. One reason why a prisoner might file a habeas petition rather than bringing a civil rights claim is that the restrictions of the Prison Litigation Reform Act ("PLRA"), 11 U.S.C. § 523; 18 U.S.C. §§ 3624, 3626; 28 U.S.C. §§ 1346, 1915, 1915A; 42 U.S.C. §§ 1997–1997h, do not apply to habeas petitions. *See, e.g., Martin v. Bissonette*, 118 F.3d 871, 874 (1st Cir.1997) (discussing the uniform case law holding that the PLRA does not apply to habeas claims); *Inmate Litigation I, supra*, at 1638 n. 277. Moreover, as the Court discusses below, the filing fee for habeas petitions is significantly lower than the filing fee for ordinary civil actions.

ing judgments of prison system officials, and that "[w]here a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities"). There are no relevant differences between Section 1983 actions and *Bivens* actions, or between provisions governing habeas relief with regard to state and federal prisoners, that would suggest that the Section 1983 cases should not apply to this case. Moreover, the prohibition against cruel and unusual punishment applies to both federal and state governments through the Eighth and Fourteenth Amendments, respectively. There is little difference in what our legal system's conceptions of due process and equal protection concepts demand of the federal and state governments, *see Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), so it is difficult to see why the courthouse doors should be more open to state prisoners than federal.

Looking at both state and federal prisoner cases, there are many indications that habeas will in fact lie for certain conditions of confinement claims. The Supreme Court has left open the possibility that a state prisoner's conditions of confinement claim could be brought as a habeas corpus action, rather than an action under 42 U.S.C. § 1983. *See Preiser*, 411 U.S. at 499–500, 93 S.Ct. 1827 (citing Note, *Developments in the Law—Habeas Corpus*, 83 Harv. L.Rev. 1038, 1084 (1970)); *Bell*, 441 U.S. at 526 n. 6, 99 S.Ct. 1861; *Dickerson v. Walsh*, 750 F.2d 150, 153 n. 5 (1st Cir. 1984) (citing *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), *Bradshaw v. Carlson*, 682 F.2d 1050 (3d Cir.1981), *Cardaropoli v. Norton*, 523 F.2d 990 (2d Cir.1975), and *Mead v. Parker*, 464 F.2d 1108 (9th Cir.1972), as examples of cases where a prisoner was permitted to challenge conditions of confinement through a habeas petition).

The First Circuit has stated in dicta that certain kinds of conditions of confinement actions can be brought as habeas petitions. In *Brennan v. Cunningham*, 813 F.2d 1 (1st Cir.1987), the court held that a prisoner's claim for reinstatement in a work release program could proceed as a habeas petition. *Id.* at 4–5. The court "[did] not agree that *Preiser* would mandate that the reinstatement claim be brought as a § 1983 action[,] even if we were to accept appellant's characterization of the claim as a challenge to the conditions of confinement[, because in] *Preiser*, the Court specifically left open the possibility that a challenge to prison conditions, cognizable under § 1983, might also be brought as a habeas corpus claim." *Id.* at 4. The court rested its holding primarily on the ways in which the reinstatement claim resembled a challenge to the fact or duration of incarceration, but its statement of the law on the question this Court is now considering indicated not only that the question was open as a matter of Supreme Court precedent, but that in the First Circuit at least some conditions of confinement claims could be brought as habeas corpus petitions, subject to obvious limitations (for example, release from incarceration would rarely be an available form of relief in such habeas actions). *See id.* at 4–5.

Like the First Circuit, other courts often permit challenges to conditions of confinement to proceed under a habeas petition when some action taken or procedure used by prison administrators creates a likelihood that the period of incarceration will be longer. *See, e.g., Bostic v. Carlson*, 884 F.2d 1267, 1269 (9th Cir.1989); *McCollum v. Miller*, 695 F.2d 1044, 1047 (7th Cir. 1982). Some have gone still further, asserting that habeas will lie to challenge conditions that do not in any way implicate the fact or duration of confinement. *See Boudin v. Thomas*, 732 F.2d 1107, 1111–12 (2d Cir.1984) (collecting cases).

For most conditions of confinement claims, however, and particularly for those involving inadequate medical treatment, courts usually hold that habeas relief is not available. *See, e.g., Lee v. Winston,* 717 F.2d 888, 893 (4th Cir.1983); *United States v. Sisneros,* 599 F.2d 946, 947 (10th Cir. 1979); *Crawford v. Bell,* 599 F.2d 890, 891–92 (9th Cir.1979). *But cf. Albers v. Ralston,* 665 F.2d 812, 815 (8th Cir.1981) (noting that a habeas action will lie to challenge conditions of confinement where substantial constitutional violations were alleged). This Court is of the view that, with the exception of extreme cases where transfer or release might be a necessary remedy, most challenges to the constitutional adequacy of medical care should proceed as civil rights claims under *Bivens* or Section 1983, or as an ordinary civil action under federal law.

### 1. Inappropriateness of Dismissing Prisoner Suits for Inartful Pleading

 Even when habeas is not the proper form of action, however, courts should not dismiss claims, but rather should either treat the habeas petition as if it were filed as a civil rights claim, or require the petitioner to amend his claim. *See Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam) (holding that a pro se prisoner complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); *Reyes v. Supervisor of Drug Enforcement Admin.,* 834 F.2d 1093, 1095 (1st Cir.1987) (examining the relief requested and the facts alleged to supply legal bases for a prisoner's claims); *see also Caldwell,* 790 F.2d at 595 ("It is well settled that . . . we construe *pro se* complaints liberally. . . . It is also well-settled that Fed.R.Civ.P. 8(a)(1) does not

require a plaintiff to set forth the statutory basis for the district court's subject-matter jurisdiction in order for the court to assume jurisdiction, so long as he alleges facts sufficient to bring the case within the court's jurisdiction."); *Lee,* 717 F.2d at 892–93; *McKinnis v. Mosely,* 693 F.2d 1054, 1057 (11th Cir.1982); *Moorish Science Temple of Am., Inc. v. Smith,* 693 F.2d 987, 989–91 (2d Cir.1982); *Weaver v. Wilcox,* 650 F.2d 22, 26 & n. 10 (3d Cir. 1981); *Crawford,* 599 F.2d at 893. Such treatment is consistent with the principle, announced in a Supreme Court prisoner case, that pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers." *Haines,* 404 U.S. at 520, 92 S.Ct. 594; *see also Reyes,* 834 F.2d at 1095. It is also consistent with the principle that "[i]n behalf of the unfortunates, federal courts should act in doing justice if the record makes plain a right to relief." *United States v. Morgan,* 346 U.S. 502, 505, 74 S.Ct. 247, 98 L.Ed. 248 (1954). More importantly, it is consistent with the interpretive principles this Court has laid out with respect to protecting disfavored groups generally, and with respect to enforcing rights under the Constitution and international law in particular.

There is some contrary authority, however. For example, *Boyce v. Ashcroft,* 251 F.3d 911 (10th Cir.2001), affirmed the dismissal of a federal prisoner's habeas petition that challenged conditions of confinement, on the grounds that such a claim would have to be brought in the form of a civil rights action under *Bivens. Id.* at 914, 917–18 (citing *Rael v. Williams,* 223 F.3d 1153, 1154 (10th Cir.2000)), *judgment vacated on other grounds on reh'g,* 268 F.3d 953 (10th Cir.2001). The Tenth Circuit acknowledged that in *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718, the Supreme Court exercised jurisdiction over a challenge to conditions

of confinement in the form of a habeas petition, without commenting on the jurisdictional issue. *See Boyce,* 251 F.3d at 915–16. The Tenth Circuit reasoned, however, that under *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54 (1952), a case that does not address jurisdiction cannot be cited as authority for exercising jurisdiction. *See Boyce,* 251 F.3d at 915–16.[85]

This Court disagrees with the Tenth Circuit's approach, but even if it did not, First Circuit law would compel the Court to ally itself with the Second, Third, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits in holding that a pro se prisoner's failure to plead a claim under the correct cause of action is not, in itself, grounds for dismissal. *See Reyes,* 834 F.2d at 1095; *Dickerson,* 750 F.2d at 153. Although *Dickerson* is not directly on point, its approval of cases permitting challenges to conditions of confinement through habeas and its invocation of "the basic policies of habeas corpus relief," *id.* at 153, suggest that the courthouse doors should not be slammed shut for pro se prisoners who fail to understand a distinction that few licensed attorneys understand, and about which courts continue to disagree.

Indeed, even if Kane had brought a habeas petition challenging both the conditions and the fact of his confinement, the proper course would be to allow the former as a *Bivens* action and the latter as a habeas action, and to hear both at once

with that understanding. *Preiser* itself makes clear that nothing precludes a state prisoner from simultaneously challenging the fact or duration of his confinement in a habeas petition and challenging conditions of his confinement in a Section 1983 action. *Preiser,* 411 U.S. at 499 n. 14, 93 S.Ct. 1827.

## 2. Alternatives to Dismissal

The next question is whether the proper course is simply to treat the action as if it were properly pleaded (with notice to the parties), or rather to require amendment. As a practical matter, the former is more sensible. Habeas corpus and civil rights law are notoriously complex, reminiscent of the common law writ system that the Federal Rules of Civil Procedure were supposed to eliminate, and there is little reason to believe that a pro se litigant's exposition on one or the other will provide much assistance to the Court or make it much easier for the government to respond. Moreover, it seems undesirable to increase the substantial amount of time it already takes to process prisoners' claims. Among the 63 percent of state prisoner challenges to state court convictions that get dismissed without consideration of the merits,[86] district courts take an average of 268 days to reach that result. Roger A. Hanson & Henry W.K. Daley, Bureau of Justice Statistics, *Federal Habeas Corpus Review: Challenging State Court Criminal Convictions* 17, 23, *at* http:// www.ojp. usoj.gov/bjs/pub/pdf/dfhcrcscc.pdf (Sept.

85. The Supreme Court did in fact address jurisdiction in *Bell,* but refused to reach the jurisdictional question because the government had not raised it at any point in the proceedings. *Bell,* 441 U.S. at 526 n. 6, 99 S.Ct. 1861. In addition, the petitioners had pled an alternative basis for jurisdiction—28 U.S.C. § 1361—"[a]nd, at the time of the relevant orders of the District Court in this case,

jurisdiction would have been provided by 28 U.S.C. § 1331(a)." *Id.*

86. Fifty-seven percent of the dismissed petitions are dismissed for failure to exhaust state remedies. Roger A. Hanson & Henry W.K. Daley, Bureau of Justice Statistics, *Federal Habeas Corpus Review: Challenging State Court Criminal Convictions* 17, *at* http://

1995). Those considered on the merits take an average of 477 days. *Id.* at 23. Ten percent of all habeas petitions take 761 days or more to resolve. *Id.* at 19.[87] Of course, these figures do not simply indicate a lack of diligence on the part of district courts; in some cases involving "mixed petitions," which include both exhausted and unexhausted claims, the delay in resolution results from the district court staying proceedings while the petitioner exhausts remaining claims. *See Nowaczyk v. Warden,* 299 F.3d 69, 79 (1st Cir.2002) (recognizing "a growing consensus that a stay is *required* when dismissal [of a mixed petition] could jeopardize the petitioner's ability to obtain federal review"); *see also Duncan v. Walker,* 533 U.S. 167, 183, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (Stevens, J., concurring, joined by Souter, J.); *id.* at 192, 121 S.Ct. 2120 (Breyer, J., dissenting, joined by Ginsburg, J.); *Neverson v. Farguharson,* No. 03–1385, 2004 WL 943604, at *8 (1st Cir. May 4, 2004).

 In this case, anyway, proceeding as if Kane had correctly pled his action is the better course. First, the Court has already had this case for over a year, and the added value, if any, of permitting amendment of pleadings and additional filings would not justify further delay. Second, the primary dispositive task in this case involves analysis of facts already submitted, not resolution of intricacies in civil rights law. Third, the parties' arguments center around two issues that would be essentially identical whether the case were treated as a habeas case or a civil rights case: exhaustion of administrative remedies and legal adequacy of the medical treatment Kane is receiving. The Court cannot think of a single important argument that the Warden would have raised, had he known he was defending against a *Bivens* action rather than a habeas petition. Fourth, the only party who would potentially be prejudiced by the Court's failure to take the amendment route is the Warden, but as it happens, the Court's decision runs in his favor anyway.

Whether a court permits a conditions of confinement claim to proceed as such,

---

www.ojp.usdoj.gov/bjs/pub/pdf/fhcrcscc.pdf (Sept.1995).

**87.** In this District, the average resolution time for cases decided on the merits is lower than the national average, but the average resolution times for other habeas cases, and for all categories of habeas cases combined, are higher. In 2001, 102 habeas corpus petitions challenging state court convictions were filed in this District. As of April 30, 2004, 37 of those petitions (36.27%) had been decided on the merits, taking an average of 415 days to resolve. That is 62 days faster than the national average. Fifteen (14.71%) had been dismissed for failure to exhaust state remedies, and on average it took 387 days for those petitions to be dismissed. Thirty-seven (36.27%) had been terminated for other reasons (usually failure to pay a filing fee or to file an amended petition), and took an average of 196 days to resolve. Thirteen (12.75%) remain pending. If the Court presumes that those 13 scatter evenly around July 2, 2001 (the midpoint of the year), and that those cases will be resolved by the end of this year, those cases will take an average of 1,278 days to resolve. If the Court presumes that all 13 will be dismissed without reaching the merits, then this District takes an average of 458 days to dispose of habeas petitions without reaching the merits, 190 days more than the national average. Because it is difficult to know how accurate this presumption is, a comparison of overall disposition times may be more informative. The national average is 345 days to dispose of a habeas petition. The average in this District is roughly 443 days, and will become longer if the unresolved cases are not resolved this year. As the Court discusses below, the length of resolution to some degree reflects the laudable practice of staying proceedings while a petitioner exhausts unexhausted claims. It is at least possible that this District takes longer than average to resolve habeas cases in part because judges here engage in this practice more consistently than in other districts.

treats it as a Section 1983 or *Bivens* claim, or requires the petitioner to change his pleadings to make his action a civil rights action rather than a habeas one; even the judicial branch's most steadfast champions of prisoners' rights agree that prisoners must not be permitted to circumvent the regimes associated with the more appropriate class of action by styling their claim as one within the other class. *See, e.g., Preiser,* 411 U.S. at 524 n. 24, 93 S.Ct. 1827 (Brennan, J., dissenting, joined by Douglas & Marshall, JJ.). Thus, a claim like Kane's should be subjected to any procedural or other requirements applicable to *Bivens*-style claims, and cannot be remedied through release, as that remedy is only available for "true" habeas claims.

### 3. Impact of the Prison Litigation Reform Act

■ One potential issue remains. The Prison Litigation Reform Act ("PLRA"), 11 U.S.C. § 523; 18 U.S.C. §§ 3624, 3626; 28 U.S.C. §§ 1346, 1915, 1915A; 42 U.S.C. §§ 1997–1997h, has placed certain restrictions on inmate petitions.[88] The First Circuit has not yet resolved whether, under the PLRA, a court can permit a prisoner to amend his complaint to state more accurately his legal claim. Under 42 U.S.C. § 1997e(c), in suits by prisoners:

> The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim on which relief can be granted, or seeks monetary

relief from a defendant who is immune from such relief.

*Id.*

The Sixth Circuit would interpret this provision as denying district courts discretion to permit amendment in cases where the complaint of a prisoner with a potentially valid grievance fails to state a claim on which relief can be granted. *Cf. Baxter v. Rose,* 305 F.3d 486, 488–89 (6th Cir. 2002) (citing *McGore v. Wrigglesworth,* 114 F.3d 601, 612 (6th Cir.1997)) (noting the similarity of Section 1997e(c) to 28 U.S.C. § 1915(e)(2), which the *McGore* court had held to require *sua sponte* dismissal for failure to state a claim on which relief can be granted).

The Third Circuit, however, has held that Section 1997e(c) "did not change the procedures our court previously adopted regarding the dismissal of a complaint without granting leave to amend." *Shane v. Fauver,* 213 F.3d 113, 114–15 (3d Cir. 2000). Those procedures required district courts to offer plaintiffs a chance to amend before dismissing their cases, if it appeared that amendment could cure any deficiencies in the complaint. *Id.* at 116. Numerous courts have held that if a prisoner has a potentially valid claim, and if Federal Rule of Civil Procedure 15 would permit amendment as of right, a court may not dismiss the case *sua sponte* without permitting amendment. *See id.* at 114–15 (addressing Section 1997e(c)); *see also Troville v. Venz,* 303 F.3d 1256, 1260 (11th Cir.2002) (addressing 28 U.S.C. § 1915(e)(2)(B)(ii), which requires a district court to dismiss a case brought in forma pauperis if the "action or appeal" fails to state a claim on which relief can be granted); *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 106 (3d Cir.2002)

---

**88.** For a good general discussion of the PLRA, see John Boston, *The Prison Litigation Reform Act, in 16th Annual Section 1983 Civil* *Rights Litigation Handbook,* 640 PLI/Lit 687 (2000).

(same); *Razzoli v. Federal Bureau of Prisons,* 230 F.3d 371, 377 (D.C.Cir.2000) (addressing 28 U.S.C. § 1915A(b)(1)); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (en banc) (addressing Section 1915(e)(2)(B)(ii)); *Bass v. Parkwood Hosp.,* 180 F.3d 234, 247 (5th Cir.1999) (same); *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir.1999) (same); *Perkins v. Kansas Dep't of Corr.,* 165 F.3d 803, 806 (10th Cir.1999) (same).

The language of 42 U.S.C. § 1997e(c) does not clearly mandate either result, and it seems unlikely that when drafting Section 1997e(c), Congress was considering cases where a prisoner with a colorable claim merely invokes the wrong statute. The "fails to state a claim upon which relief can be granted" language obviously mirrors Federal Rule of Civil Procedure 12(b)(6). As this Court has already shown, before passage of the PLRA, courts commonly treated cases pled under the wrong cause of action as if they had been pled properly. If Congress wishes to deprive courts of their traditional powers, it must clearly state its intention to do so. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 319–20, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Hecht Co. v. Bowles,* 321 U.S. 321, 330, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Given the liberality of the Federal Rules' pleading requirements, *see Dewey v. University of N.H.,* 694 F.2d 1, 3 (1st Cir. 1982), the additional allowances made for pro se litigants, *Haines,* 404 U.S. at 520–21, 92 S.Ct. 594, the canons of interpretation regarding protection of prisoners and vindication of rights under the Constitution and international law, and the practical reasons this Court has given for not requiring amendment, Section 1997e(c) cannot reasonably be interpreted to require dismissal of Kane's action.

Moreover, the Constitution requires careful scrutiny of any statute that re-stricts or penalizes exercise of the right, guaranteed under the First and Fourteenth Amendments, to petition the government (including the judicial branch) for redress of grievances. One can see this principle at work in the *Noerr-Pennington* doctrine, which generally immunizes individuals or entities petitioning governmental bodies from suit under the federal antitrust laws, with an exception for "sham" petitions. *See United Mine Workers of America v. Pennington,* 381 U.S. 657, 669, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 138–39, 144, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *see also Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 55–56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (concluding that the sham litigation exception to *Noerr-Pennington* immunity must be construed narrowly); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 914–20, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (holding that participants in civil rights boycotts could not be held liable under state law for economic damages resulting from boycott, except to the extent that participants engaged in violence).

Under 28 U.S.C. § 1915(g), a prisoner is generally barred from filing further civil actions (as opposed to "true" habeas petitions) if he has had three or more civil actions or appeals dismissed on the grounds that they were frivolous or malicious or failed to state a claim on which relief can be granted. Thus, whenever a court determines that dismissal is required under 42 U.S.C. § 1997e(c), it also makes future access to the courts more difficult, and thus both imposes a penalty for filing a suit and limits the future exercise of the right to petition the courts. Just as immunity from suit under the antitrust laws does not extend to "sham" petitions, so Congress can penalize prisoners who

abuse the legal system. It would raise serious constitutional questions, however, to interpret 42 U.S.C. § 1997e(c) to penalize the filing of a colorable claim whose only failing is inartful pleading.

In light of the background understanding of the application of Rule 12(b)(6)'s language, a background against which Congress legislated, 'and in light of the many interpretive presumptions that the Court has discussed, the most reasonable reading of Section 1997e(c) is that complaints like Kane's do not "fail[ ] to state a claim upon which relief can be granted." If Congress wanted courts to construe inmate complaints more narrowly, or to dismiss *without permitting amendment*, it could easily have added language to that effect. Thus, so long as the governmental defendant is on notice as to what the prisoner is alleging, and has an opportunity to raise any defenses it could raise under the correct cause of action, Section 1997e(c) does not require dismissal.

A contrary holding would frustrate the PLRA's purpose. There is nothing in the PLRA's legislative history to suggest that Congress intended to keep meritorious claims out of court.[89] Rather, the additional procedural hurdles the PLRA erects, and the additional case management powers it gives to district courts, are best understood as seeking to increase the quality of inmate complaints, weeding out the frivolous ones and giving the courts more time to review legitimate ones.[90] It

**89.** Senator Orrin Hatch, Chair of the Senate Judiciary Committee, said the following when he introduced the PLRA's predecessor bill on the Senate floor:

> This landmark legislation will help bring relief to a civil justice system overburdened by frivolous prisoner lawsuits. Jailhouse lawyers with little else to do are tying our courts in knots with an endless flood of frivolous litigation.
>
> Our legislation will also help restore balance to prison conditions litigation and will ensure that Federal court orders are limited to remedying actual violations of prisoners' rights, not letting prisoners out of jail. It is past time to slam shut the revolving door on the prison gate and to put the key safely out of reach of overzealous Federal courts.
>
> ... While prison conditions that actually violate the Constitution should not be allowed to persist, I believe that the courts have gone too far in micromanaging our Nation's prisons.

141 Cong. Rec. S14,418 (daily ed. Sept. 27, 1995) (statement of Sen. Hatch). Senator Hatch's statements were representative of views expressed by other advocates for the bill.

Many federal judges believe that prisoners are excessively litigious and prone to bring frivolous lawsuits, but an examination of the facts reveals this belief to be erroneous. What for free citizens would be a dispute with another private citizen, such as a landlord or banker, is necessarily a dispute with the state for prisoners. *Preiser*, 411 U.S. at 492, 93 S.Ct. 1827. Professor Schlanger has compared inmate litigation rates to those in the population at large, relying on assumptions that, if anything, would exaggerate prisoners' litigiousness, and yet has determined that filing rates for inmates and citizens on analogous claims are roughly equal. *Inmate Litigation I, supra*, at 1576. Moreover, although absolute numbers of inmate filings have increased in the last three decades of the twentieth century, this has been primarily due to the steady growth in the incarcerated population during that time, not to increased litigiousness. *Id.* at 1585. Admittedly, prisoner suits have a much lower success rate than other suits, *id.* at 1593–96, but the high standards prisoners must meet to prove violations, the absence of counsel, the low cost of litigation, and numerous obstacles to settlement all at least partly explain the inmate docket's apparent "low quality," *id.* at 1605–22.

**90.** The PLRA has altered the operation of other Federal Rules of Civil Procedure, such as Rule 4 (issuance of a summons), Rule 53 (special masters), and Rule 55 (default judgments). *See Inmate Litigation I, supra*, at 1562. This Court is aware of only one other statute that has effected similar procedural changes: the Private Securities Litigation Reform Act of 1995, codified in scattered sec-

is by no means clear that the PLRA is succeeding in that regard, *see generally Inmate Litigation I*,[91] but this does not mean that Congress's purpose was other than the Court has suggested. Courts cannot lightly presume that Congress has an intent hostile to our legal system's firmly embedded commitments to providing access to the courts to vindicate valid human rights claims, and interpreting the PLRA as a deliberate attempt to thwart such claims would obviously raise serious constitutional questions.

It may be objected that the Court's interpretation makes the language in Section 1997e(c) requiring dismissal of "frivolous" claims superfluous. This would be a serious charge, because courts "express a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990), *overruled on other grounds by* Criminal Victims Protection Act of 1990, Pub.L. 101–581, § 3, 104 Stat. 2865. Under the Court's interpretation, however, "frivolous" and "fails to state a claim on which relief can be granted" retain independent meaning, and Congress included both to ensure that no baseless suits could slip through the cracks. It is possible for a complaint to fail to allege sufficient facts to justify relief, without being frivolous. There are instances where an injury inflicted by a prison official, though objectionable and of a sort that would be actionable if inflicted on a nonprisoner or by a private actor, does not violate a prisoner's rights. In such instances, an action for damages or an injunction might be reasonable and nonfrivolous, even though the law clearly provided no remedy for the injury. More to the point, a legally adequate complaint might still be frivolous, in light of facts of which a court could not ordinarily take judicial notice, but which could easily be verified as incontrovertible.

Somewhat more troubling is the term "malicious." It seems that, to have independent meaning, the term must permit dismissal of some class of claims that are both legally sufficient and nonfrivolous. This problem exists regardless of how broadly or narrowly a court interprets the phrase "fails to state a claim on which relief can be granted," however, so it does not constitute a bar to the Court's interpretation. The extent to which a court may dismiss a nonfrivolous, legally sufficient claim based solely on an evaluation of the prisoner's intent in filing suit may thus safely be left for another day. *Cf. Professional Real Estate Investors*, 508 U.S. at 57, 113 S.Ct. 1920 ("We left unresolved the question presented by this case—whether litigation may be sham merely because a subjective expectation of success does not motivate the litigant. We now answer this question in the negative and hold that an objectively reasonable effort to litigate cannot be sham regardless of subjective intent.").

## D. Merits of the Parties' Motions

### 1. Kane's Motion to Appoint Counsel

■ Before proceeding further, the Court must determine whether counsel

tions of 15 U.S.C. *Inmate Litigation I, supra*, at 1562 (citing Thomas E. Willging, *Past and Potential Uses of Empirical Research in Civil Rulemaking*, 77 Notre Dame L.Rev. 1121, 1196 (2002)).

**91.** Professor Schlanger argues that "the statute seems to be making even constitutionally

meritorious cases harder both to bring and to win." *Inmate Litigation I, supra*, at 1557. In 2001, inmate filings were down 43% from their 1995 peak, despite a 23% increase in the national population of incarcerated people during that time, *id.* at 1559–60, but inmates' rate of success has actually *decreased, id.* at 1658.

should be appointed for Kane. "The law is well established that there is no constitutional right to appointment of counsel in a civil case." *Cookish v. Cunningham,* 787 F.2d 1, 2 (1st Cir.1986) (citing *Andrews v. Bechtel Power Corp. & Local 276, Plumbers & Pipefitters Union,* 780 F.2d 124, 137 (1st Cir.1985)). Under 28 U.S.C. § 1915(e)(1), however, "[t]he court may request an attorney to represent any person unable to afford counsel." The First Circuit requires a litigant seeking appointment of counsel in a civil case to demonstrate "exceptional circumstances" justifying such appointment. *Cookish,* 787 F.2d at 2. The factors considered in deciding whether exceptional circumstances exist "include the indigent's ability to conduct whatever factual investigation is necessary to support his or her claim; the complexity of the factual and legal issues involved; and the capability of the indigent to present the case." *Id.* at 3 (citations omitted).

The Court denies Kane's motion to appoint counsel. He clearly has access to the medical records and the scientific and legal materials he needs to make his case. Although this case raises some factually and legally complex issues, most of those issues are ancillary to the basic questions regarding whether Kane's medical treatment meets the standards laid down by the Constitution and by BOP regulations. Those latter questions are decidedly less complex, and Kane has demonstrated himself fully capable of presenting his case on them. Moreover, the Court has resolved virtually all of the more complex legal questions in Kane's favor. The factually complex questions involve the medical science surrounding diagnosis and treatment of hepatitis C, but in this case the parties have reasonably agreed that certain medical texts provide accurate information, and the Court has had no difficulty absorbing the information in those texts and applying it to this case.

### 2. Kane's and the Warden's Motions for Summary Judgment

#### a. Summary Judgment Standard

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the nonmoving party, no genuine issues of material fact remain. Fed. R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the Court must view the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 490, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

The moving party bears the burden of showing that there is no genuine issue of material fact and that said party is therefore entitled to judgment as matter of law. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant satisfies this burden, the nonmovant must proffer evidence supporting the existence of a genuine issue of material fact. *Donovan v. Agnew,* 712 F.2d 1509, 1516 (1st Cir.1983). The adverse party may not rest upon mere allegations or denials; she must set forth specific facts showing that a genuine issue exists. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

#### b. Exhaustion of Administrative Remedies

The Court must now determine whether and to what extent Kane has ex-

hausted his administrative remedies, as required under 42 U.S.C. § 1997e(a). This is true even though Kane filed his action as a habeas petition, because it is in substance a "conditions of confinement" claim. The Court notes that Kane need not plead exhaustion; rather, failure to exhaust is an affirmative defense that the Warden must plead, and has pled. The Court thus parts company with courts that have required prisoners to plead exhaustion in their complaints. *Compare Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir.1998) (per curiam) (imposing such a pleading requirement), *with Wyatt v. Terhune*, 315 F.3d 1108, 1117 (9th Cir.2003) (treating exhaustion as an affirmative defense), *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir.2002) (same), *Jackson v. District of Columbia*, 254 F.3d 262, 267 (D.C.Cir.2001) (same), *Foulk v. Charrier*, 262 F.3d 687, 697 (8th Cir.2001) (same), *Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532, 536 (7th Cir.1999) (same), *and Jenkins v. Haubert*, 179 F.3d 19, 28–29 (2d Cir.1999) (same).

In this case, the BOP acknowledges that Kane has "arguably" exhausted his administrative remedies with regard to the claims that were the subject of his filed grievance and administrative appeals. Def.'s 56.1 Stmt. ¶ 2. As the Court has stated, failure to exhaust is an affirmative defense, which the Warden must raise, so to the extent he does not raise it with respect to the claims included in the May 29, 2001 grievance, it is waived. In any case, the Warden has not pointed the Court to other procedures that Kane could have invoked to pursue the claims laid out in his May 29, 2001 grievance.

■ In reading the text of the denials of Kane's appeals, up to and including the last denial on September 20, 2001, the Court finds that the reviewing officials were able to review actions taken since the filing of the May 29, 2001 grievance, and that they did so. The Court therefore holds that Kane has exhausted administrative remedies for any claims based on conduct or inaction regarding his request for combination therapy occurring before September 20, 2001. The rationale behind exhaustion requirements is to give the relevant decisionmaker an opportunity to correct any errors or legal wrongs committed, and the BOP had the opportunity to do that for any relevant grievances that Kane had as of September 20, 2001. Kane has not exhausted administrative remedies with regard to any actions or inaction by the Warden or the BOP after that date, however; he has not even sought administrative review.

Kane argues that he need not exhaust administrative remedies, because grave harm is threatened, and invocation of administrative remedies would be futile. The Court disagrees. Kane has not made anything approaching the required showing for futility. The appeals decisions in the record accurately describe Kane's complaint, his condition, his treatment, the governing regulations, and the application of those regulations to his case. The appeals decisions in fact reached correct results, given the governing regulations, whose constitutional and statutory adequacy have not been challenged.

Moreover, the appeals process appears to move with remarkable speed; it took less than four months to proceed from the filing of a grievance to a final appeal decision. Kane's September 5, 2002 biopsy indicated that his hepatitis C is currently mild grade and stage, and even with the aggravating factors that apply to Kane, his disease does not progress so quickly that a requirement that he pursue another four-month round of administrative proceedings places him in any danger. Indeed, Kane has not given this Court any reason to

believe that the BOP would deny him combination therapy, should he qualify for it.

As for Kane's claim that the BOP has retaliated against him by "transferring [him] to another Unit in the Compound, and putting him to work," Pl.'s Pet. Mem. ¶ 12, the Warden has properly raised a failure to exhaust defense as to all claims based on conduct or inaction occurring after September 20, 2001, including this one. Although this Court takes Kane's allegation seriously, he must exhaust administrative remedies before raising it here.

### c. Merits of the Motions

■ The proper question before the Court is whether Kane's care up to September 20, 2001 violated BOP regulations or the Constitution, and the Court holds that it did neither. For purposes of this case, the Court need not discuss Kane's constitutional claim. Kane has made no allegation that BOP regulations themselves are unconstitutional, and he certainly has provided no evidence to that effect. Therefore, unless and until the Court is presented with evidence to the contrary, the Warden and the BOP comply with constitutional standards to the extent that they follow the BOP regulations at issue in this case.

Under the *BOP Practice Guidelines*, "[t]he presence of moderate to severe fibrosis and inflammation and necrosis on liver biopsy are currently the best markers for determining who should be offered antiviral therapy for hepatitis C." *BOP Practice Guidelines* at 41. Thus, if a chronic hepatitis C patient's biopsy reveals portal or bridging fibrosis and at least moderate inflammation and necrosis, antiviral therapy is "recommended." *Id.* at 44. As of Kane's September 5, 2002 biopsy, his hepatitis C was mild grade and stage, although it came close to being moderate grade and stage.

Under the *BOP Practice Guidelines*, although all HCV genotypes are candidates for treatment, doctors are urged to consider the fact that patients with genotype 1 have response rates of 40 to 45 percent to combination therapy, whereas those with genotypes 2 and 3 have response rates of 76 to 82 percent. *Id.* at 44. Kane has genotype 1, making him less likely to respond favorably to treatment. Moreover, for inmates who, like Kane, are infected with both HBV and HCV, "[a]ntiviral therapy ... should be initiated with great caution, and only in consultation with a specialist ... due to the uncertainty of the risks and benefits of treatment and lack of a recommended treatment regime." *Id.* at 48. Although there do not appear to be any "absolute contraindications" for interferon or ribavirin that apply to Kane, *see id.* App. 9, at 73, HBV co-infection, poorly controlled diabetes, and history of recent alcohol abuse or illicit drug usage constitute potentially relevant "relative contraindications." *See id.*

Thus, as of September 20, 2001, Kane did not fall into the category of patients for whom combination therapy is "recommended." Roughly a year after that date, Kane received a liver biopsy, and even then he did not fall into that category. At least two factors, Kane's HBV coinfection and his HCV genotype, incline against his receiving combination therapy, so the Court cannot say that BOP regulations required combination therapy even after the biopsy, much less a year earlier.

The record suggests that as of September 20, 2001, Kane's disease was being monitored in compliance with BOP regulations. Moreover, examining the record in the light most favorable to Kane, such monitoring continued throughout the period for which he submitted medical records. Kane has received a biopsy, and will likely receive another one in the near

future, given that under the *BOP Practice Guidelines,* inmates who fall short of moderate grade and stage hepatitis C "should be rebiopsied every one to five years," but should be rebiopsied within one year or considered for treatment if they have minimal fibrosis and marked hepatocellular necrosis. *Id.* at 44. If Kane wishes to challenge the adequacy of the care he is receiving after another biopsy, he must again exhaust the prison system's administrative remedies, a process that the record before this Court suggests should not take long.

### 3. Kane's Motion for a Jury Trial

Given that the Court has awarded summary judgment to the Warden, Kane's motion for a jury trial is denied as moot.

### E. PLRA Provisions Governing Filing Fees and Frivolous Suits

Kane filed his action as a habeas petition, but this Court has determined that it is in fact a civil rights action, generally subject to the strictures of the PLRA. This has two potentially important consequences. The first is that this suit might constitute a first "strike" for Kane. A prisoner is generally barred from filing further civil actions (as opposed to "true" habeas petitions) if he has had three or more civil actions or appeals dismissed on the grounds that they were frivolous, malicious, or failed to state a claim on which relief can be granted. 28 U.S.C. § 1915(g). The second issue is that 28 U.S.C. § 1915 requires all prisoners bringing civil actions (again, as opposed to habeas petitions) to pay the appropriate filing fee, even if they are proceeding in forma pauperis. The fee for habeas petitions is $5, and the fee for civil actions is $150. 28 U.S.C. § 1914(a).

■ The Supreme Court's recent decision in *Castro v. United States,* —— U.S.

——, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003), provides important guidance in answering both questions. The Supreme Court held that a district court cannot convert a federal prisoner's motion for a new trial under Federal Rule of Criminal Procedure 33 into a habeas corpus petition under 28 U.S.C. § 2255, unless the court informs the litigant of its intent to recharacterize, warns the litigant of the consequences, and offers an opportunity to withdraw or amend the filing. *Id.* at 789. If these procedures are not followed, the Rule 33 motion cannot be considered a habeas petition for purposes of applying the limitations that Section 2255 places on "second or successive" habeas petitions. *Id.* The idea is that the courts' well-established power to recharacterize prisoner complaints to ensure that technicalities do not bar consideration of a valid claim should not be used to penalize pro se litigants for their lack of legal sophistication. *Castro* thus does not constitute an absolute bar to recharacterization without notice; rather, it precludes such recharacterization in cases where it can have "serious consequences" for the prisoner. *Id.*

■ With regard to the "three strikes" provision in 28 U.S.C. § 1915(g), recharacterization would have different consequences in different cases, depending on such factors as whether a prisoner had filed previous habeas petitions or was already subject to a time bar for potential habeas claims, whether the claim was in fact frivolous, and whether the prisoner had previous "strikes." This is not a problem for Kane, however, because the Court holds that the disposition of this case does not rest on grounds of frivolity, malice, or failure to state a claim. Kane's claim was colorable, though ultimately unsuccessful, so it cannot count as a "strike" under the PLRA. The Court therefore holds that Kane's action should be regarded as an

ordinary civil action, not a habeas petition, because failure to do so could only limit Kane's future access to habeas relief, without in any way facilitating his access to ordinary civil relief regarding his conditions of confinement.

■ As for the filing fee, Kane's suit is in reality a civil rights action, and some courts are of the view that any prisoner whose habeas petition turns out to be a disguised civil rights action must pay the higher fee. *See Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir.1997); *Williams v. Dretke,* No. 3:02–CV–413–M, 2004 WL 414915, at *2 n. 1 (N.D.Tex. Mar.4, 2004). Whatever the constitutionality of charging indigents $150 to exercise their constitutional right to petition the courts for redress of legitimate grievances, or of treating indigent prisoners differently from indigent non-prisoners, Kane is not proceeding in forma pauperis. Kane did not pay the $150 civil action fee upon filing his action, however; rather, he paid the $5 fee for habeas corpus petitions.

There are obvious fairness problems with charging Kane an additional $145 at this point, without having given him any prior notice that his action is properly characterized as a civil action. *See Castro,* —— U.S. at ——, 124 S.Ct. at 789; *United States v. Miller,* 197 F.3d 644, 652 (3d Cir.1999); *Adams v. United States,* 155 F.3d 582, 584 (1998) (per curiam). The Court has no evidence that Kane chose to treat his action as a habeas claim rather than a *Bivens* claim in bad faith. He specifically requested release as one possible form of relief, suggesting that he had genuine reasons for styling his action as a habeas petition. If the Court had noticed early on that this was in fact a civil rights action, not a habeas petition, it might have been appropriate to ask Kane whether he would prefer to pay the additional $145 or

end his suit. *See Harris v. Outlaw,* No. Civ. 03–3311ADMSRN, 2003 WL 21960731, at *1–*2 (D.Minn. Aug.14, 2003); *Brown v. United States Dep't of Justice,* No. Civ. A. 02–CV–723–Y, 2003 WL 21499358, at *1 (N.D.Tex. June 26, 2003); *cf. Castro,* —— U.S. at ——, 124 S.Ct. at 789. Although it might even be appropriate to require a prisoner who had successfully sued for money damages against the government to setoff the $145, it does not seem appropriate to demand further payment under the present circumstances.

Of course, 28 U.S.C. § 1914(a) is not phrased in permissive terms: it requires payment of the fee. The ambiguity resides not in the "shall be required" language, however, but rather in the "if a prisoner brings a civil action" language. The technical form of the action that Kane brought was not a civil action, but rather a habeas corpus petition. The distinction between the two is what drives the uniform rulings by the circuits that the PLRA does not apply to habeas corpus petitions. *See, e.g., Martin,* 118 F.3d at 874. Given the complex interplay between habeas corpus and civil rights actions, it seems doubtful that Congress considered how the PLRA should apply in cases like this one.

That being so, the Court holds that it is appropriate to exercise a certain degree of equitable discretion in these circumstances, consistent with the purposes of the PLRA. To the extent that the PLRA sought to discourage bad faith and frivolous suits, Kane's suit does not fall into either category, nor does his decision to file his case as a habeas petition, so penalizing him does not serve this purpose. To the extent that the PLRA sought to reduce the workload that prisoner suits impose on federal courts, requiring courts to make determinations in every case whether the action is a "true" habeas petition, and then to chase down filing fees after dismissal or

final judgment, hardly reduces the judiciary's administrative burdens. Kane is now on notice that claims regarding his medical treatment are civil in nature, and that he must pay the full $150 filing fee if he again brings an action like this one. This neatly tailors the charging of a filing fee to serial filing, which is more the sort of thing the PLRA is targeting.

Other courts have taken a similar approach, dismissing a habeas petition without first "converting" it to a civil rights action. *See Aponte v. California Dep't of Corr.*, No. C 03–4799WHA(PR), 2003 WL 23119275, at *1 (N.D.Cal. Dec. 23, 2003); *In re Lancellotti*, No. 01 C 6549, 2001 WL 1002479, at *1 (N.D.Ill. Aug.31, 2001); *United States ex rel. Rickard v. Sternes*, 149 F.Supp.2d 437, 447 (N.D.Ill.2001); *cf. Castro*, —— U.S. at ——, 124 S.Ct. at 789. The Court does not follow that approach in this case, because failure to recharacterize Kane's petition might limit his access to habeas relief in the future. The Court reserves for another day the question whether a prisoner's action may simultaneously be treated as an ordinary civil action for one purpose and as a habeas petition for another.

## III. CONCLUSION

Accordingly, on March 23, 2004, Kane's Motions for Appointment of Counsel [Doc. No. 14], for a Jury Trial [Doc. No. 5], and for Summary Judgment [Doc. No. 11] were DENIED, the Warden's Motion for Summary Judgment [Doc. No. 7] was ALLOWED, judgment was entered for the Warden, and no further filing fee was assessed.